FARLEY TRANSPORTATION CO., INC., Systems Terminal, Inc. and Piggyback Trailermate, Inc., Plaintiffs-Appellees,

v.

SANTA FE TRAIL TRANSPORTATION COMPANY, Defendant-Appellant.

No. 84–6269.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 6, 1985.

Decided Nov. 26, 1985.

As Amended On Denial of Rehearing April 14, 1986.

Maxwell M. Blecher, Donald R. Pepperman, Blecher, Collins & Weinstein, Los Angeles, Cal., for plaintiffs-appellees.

Cummins & White, Joseph H. Cummins, Barry L. Van Sickle, James P. Clark, Thomas E. Holliday, Jeffrey C. Briggs, Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendant-appellant.

Before WALLACE, CANBY and BEEZER, Circuit Judges.

BEEZER, Circuit Judge:

Farley Transportation Co., Systems Terminal, Inc., and Piggyback Trailermate, Inc. (collectively "Farley") brought this action against Santa Fe Trail Transportation Co. ("Santa Fe"), alleging an antitrust conspiracy in violation of sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2). Pursuant to a jury verdict, the district court entered judgment in favor of Farley. We affirm in part, reverse in part, and remand for a new trial on the issue of damages.

# I

## BACKGROUND

This case involves a common transportation arrangement referred to as "piggybacking." Under this arrangement, truck trailers are loaded onto flat railroad cars and shipped to their destination. If, for example, a company wanted to send a shipment of goods from a specific location in Los Angeles to a specific location in Chicago, the goods would be loaded into a truck trailer and driven to a railroad yard in Los Angeles. The trailer would be loaded onto a flat railroad car and shipped to Chicago. The trailer would then be removed from the railroad car and driven to its destination. This arrangement combines the convenience of trucking with the cost efficiency of railroads.

Prior to 1981, the transportation industry was heavily regulated. Published tariff schedules specified the rate that a carrier could charge, taking into account the distance, the mode of transportation, and the weight and composition of the goods. For a service charge, "shippers' agents" would help customers obtain the best possible transportation arrangement. Some shipping business was contracted through "shippers' associations," which offered the same service to their members, but on a non-profit basis.

The Interstate Commerce Commission, acting through various regional agencies, published tariff schedules for several types of "piggybacking" arrangements. Under "Plan IV," for example, the customer was responsible for driving the trailer to and from the railroad yards, while the carrier provided only rail service. The arrangement at issue in the instant case was "Plan V." Under Plan V, the carrier provided both truck service and railroad service.

Santa Fe and the Atchison, Topeka & Santa Fe Railway Company ("ATSF") are subsidiaries of the same parent corporation. Santa Fe is a trucking company; ATSF is a railroad company. In the late 1970s, Santa Fe and ATSF offered Plan V service out of Los Angeles. Although the Santa Fe Plan V was available to all shipping customers, approximately seventy-five percent of the business was provided by four shippers' agents and shippers' associations: Diversified Shippers, Streamline Shippers, Rapid Traffic Service, and Vanguard Freight Service.

Contrary to Farley's assertions, the Santa Fe Plan V, on its face, was a legitimate piggyback arrangement. But like any other piggyback arrangement, the Santa Fe Plan V was subject to a tariff schedule approved by the ICC, in this case through the regional Rocky Mountain Motor Tariff Bureau ("RMMTB"). Under the Interstate Commerce Act, it was unlawful to charge a rate not authorized by the tariff schedule.

Farley claims that Santa Fe, ATSF, and several shipper's agents and associations combined and conspired to evade the rates in the RMMTB schedule. Farley argues that the shippers' agents and associations, with the encouragement of Santa Fe, understated the weight and misstated the composition of the cargo shipped under the Santa Fe Plan V. As a result of those understatements and misstatements, the customers of the Santa Fe Plan V received a lower rate. The lower rate gave the Santa Fe Plan V a competitive advantage. Farley asserts that Santa Fe's actions violated the Sherman Act.

Farley filed the present action on October 11, 1979. Farley's Second Amended Complaint, filed July 22, 1980, alleged violations of sections 1 and 2 of the Sherman Act and section 8 of the Interstate Commerce Act by thirty-three defendants.

When the case went to trial, only two defendants remained: Santa Fe and ATSF. On January 31, 1984, the jury returned a verdict in favor of ATSF, but against Santa Fe. On March 28, 1984, the district court entered judgment for Farley in the total sum of $2,770,000. On July 31, 1984, the district court awarded Farley attorneys' fees in the sum of $482,242.00. Santa Fe appeals.

## II

### STANDARD OF REVIEW

Santa Fe moved for a directed verdict after the presentation of Farley's case, but did not renew that request for a directed verdict at the close of all the evidence before the case was submitted to the jury. As a result, the district court ruled that Santa Fe was precluded from seeking judgment notwithstanding the verdict under Federal Rule of Civil Procedure 50(b).

Under Rule 50(b), when the prerequisite of a timely motion for a directed verdict is not satisfied, "a party cannot question the sufficiency of the evidence either before the district court through a motion for judgment notwithstanding the verdict or on appeal." *Myers v. Norfolk Livestock Market, Inc.*, 696 F.2d 555, 558 (8th Cir.1982). We must therefore address the threshold question of whether we may examine the evidence for sufficiency despite Santa Fe's failure to move for a directed verdict at the close of all of the evidence.

Rule 50(b) provides in relevant part:

**(b) Motion for Judgment Notwithstanding the Verdict.**

Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 10

days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict....

Santa Fe argues that its motion for a directed verdict after presentation of the plaintiff's evidence was sufficient to preserve its objection to the sufficiency of the evidence. It contends that Rule 50(b), properly interpreted, does not require that a motion for a directed verdict be at the close of all the evidence as a prerequisite for a post-trial motion for judgment notwithstanding the verdict.

It is true that, while the first sentence of Rule 50(b) speaks of a motion for a directed verdict "at the close of all the evidence," the second sentence refers only to "a party who has moved for a directed verdict" as being entitled to move for judgment notwithstanding the verdict. However, it is clear from the structure of Rule 50(b) that the second sentence is dependent upon the first. Rule 50(b) read as a whole plainly provides that only a motion for a directed verdict made "at the close of all the evidence" preserves the legal objection to the sufficiency of the evidence for further consideration by the trial court after the return of the verdict.[1]

This understanding of the rule was expressed in the contemporary Advisory Committee Note on the 1963 amendment adopting the present language of Rule 50(b). Although we have not directly addressed the situation raised in this case, we have previously stated that "a motion for judgment n.o.v. may be entertained only if the movant has made a motion for a directed verdict *at the close of all the evidence.*" *Williams v. Fenix & Scisson, Inc.*, 608 F.2d 1205, 1207 (9th Cir.1979) (emphasis added). This interpretation of Rule 50(b)

---

1. This interpretation of Rule 50(b) is also consistent with the longstanding rule that a defendant's introduction of evidence after an unsuccessful motion for a directed verdict after the plaintiff's case "constitutes a waiver of the objection to the sufficiency of the evidence unless the motion is renewed at the time when all the evidence is in." 5A *Moore's Federal Practice* ¶ 50.05[1], at 50–43 to 50–44 (1985) (footnotes omitted); *see also Greyhound Corp. v. Blakley,* 262 F.2d 401, 405 (9th Cir.1958).

has also been generally accepted in other circuits and by commentators on federal practice. *See, e.g., Firestone Tire & Rubber Co. v. Pearson,* 769 F.2d 1471, 1478 (10th Cir.1985); *Hubbard v. White,* 755 F.2d 692, 695–96 (8th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 107, 88 L.Ed.2d 87 (1985); *Coker v. Amoco Oil Co.,* 709 F.2d 1433, 1437–38 (11th Cir.1983); *Shipman v. Central Gulf Lines, Inc.,* 709 F.2d 383, 385 (5th Cir.1983) (per curiam); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2537, at 596 & n. 31 (1971 & Supp.1985); 5A *Moore's Fedreal Practice* ¶ 50.08, at 50–73 to 50–74 (1985).

The requirement that the motion for a directed verdict must be made at the close of all the evidence to be effective under Rule 50(b) is perhaps a "strict one." *See* 5A *Moore's Federal Practice* ¶ 50.08, at 50–77. But it serves the important purpose of alerting the opposing party to the alleged insufficiency of the evidence at a point in the trial where that party may still cure the defect by presenting further evidence.

Failure to renew an earlier motion for a directed verdict may lull the opposing party into believing that the moving party has abandoned any challenge to the sufficiency of the evidence once all of the evidence had been presented. If the moving party is then permitted to make a later attack on the evidence through a motion for judgment notwithstanding the verdict or on appeal, the opposing party may be prejudiced by having lost the opportunity to present additional evidence before the case was submitted to the jury. A strict application of Rule 50(b) obviates the necessity for a court to engage in a difficult and subjective case-by-case determination of whether a failure to renew a motion for directed verdict at the close of all the evidence has resulted in such prejudice to the opposing party under the particular circumstances of that case.[2]

■■■ In general, the requirement that the motion be made at the close of all the evidence is to be strictly observed. However, there is one recognized exception to this requirement—where an earlier motion for a directed verdict has been taken under advisement by the trial judge. *See, e.g., Ebker v. Tan Jay International, Ltd.,* 739 F.2d 812, 823 (2d Cir.1984). *See generally* 5A *Moore's Federal Practice* ¶ 50.08, at 50–79. The trial court's reservation of a ruling on a motion for a directed verdict made before the close of all the evidence maintains the motion as a continuing objection to the sufficiency of the evidence, provides notice to the opposing party of the challenge, and constitutes a judicial indication that renewal of the motion is not nec-

---

**2.** The Court of Appeals for the Seventh Circuit has apparently adopted such a subjective, case-by-case application of Rule 50(b), excusing failure to move for a directed verdict at the close of all the evidence where the purposes of the rule are believed to have been satisfied.

In *McKinnon v. City of Berwyn,* 750 F.2d 1383 (7th Cir.1984), the defendant had moved for a directed verdict after the presentation of the plaintiff's case, but had not renewed the motion after the close of all the evidence. The court stated that "Rule 50(b) is not clearly drafted" and that "the requirement of renewing the motion for a directed verdict at the close of all the evidence is not intuitive." *Id.* at 1390. Accordingly, the court held that the requirement that the motion be made at the close of all the evidence, rather than earlier, as a prerequisite to challenging the evidence after the trial would not be enforced where no prejudice had resulted to the other party from failure to renew. *Id.* at 1389.

Under this Seventh Circuit approach, a court would have to consider whether the evidence presented as part of the defendant's case weakened the defendant's motion for a directed verdict, such that the plaintiff believed "the defendant, by not renewing the motion, had abandoned it because its evidentiary foundations had been weakened, and thinking this had therefore not put in rebuttal evidence that might have repaired the evidentiary deficiencies exposed by the initial motion." *Id.* at 1390.

We regard such an approach as inviting confusion. It is precisely such a difficult examination that a uniform application of Rule 50(b) is designed to avoid. We decline to adopt an interpretation of Rule 50(b), even assuming the language of the rule would so permit, that requires us to engage in a subjective analysis of the strength or weakness of the evidentiary foundation of one party's case, before we even determine whether we may review the sufficiency of the evidence on appeal.

essary to preserve the moving party's rights.

In addition, courts are somewhat more liberal about what constitutes a sufficient motion for a directed verdict at the close of all the evidence. 9 C. Wright & A. Miller, *supra* § 2537, at 596–97 & n. 32. For example, in *Bachtel v. Mammoth Bulk Carriers, Ltd.*, 605 F.2d 438, 441–42 (9th Cir.1979), *cert. granted and judgment vacated on other grounds*, 451 U.S. 978, 101 S.Ct. 2301, 68 L.Ed.2d 835 (1981), we held that a request for a jury instruction directing the jury to return a verdict in favor of the moving party was the equivalent of a motion for a directed verdict. *See also Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572, 577 (7th Cir.1976); *Jack Cole Co. v. Hudson*, 409 F.2d 188, 191 (5th Cir.1969). Likewise, an objection to a jury instruction on the ground that insufficient evidence was presented on an issue to allow it to be submitted to the jury, *Villaneuva v. McInnis*, 723 F.2d 414, 418 (5th Cir.1984), or an inartfully made or ambiguously stated motion for a directed verdict. *Mosley v. Cia. Mar. Adra S.A.*, 362 F.2d 118, 121–122 (2d Cir.), *cert. denied*, 385 U.S. 933, 87 S.Ct. 292, 17 L.Ed.2d 213 (1966), *may* constitute a "sufficient approximation" of a motion for a directed verdict to satisfy the requirements of Rule 50(b). *See Villanueva*, 723 F.2d at 418.

Viewed under this established precedent, Santa Fe has failed to satisfy the requirements of Rule 50(b). Its motion for a directed verdict was not made at the close of all the evidence. Its motion made after the close of the plaintiff's case was not taken under advisement by the trial judge, but instead was denied. Nor did Santa Fe renew the motion at the close of all the evidence by submitting an instruction requesting a directed verdict from the jury or by any ambiguous motion that was the equivalent of a motion for a directed verdict. Santa Fe's co-defendant, ATSF, did move, not for a directed verdict, but rather to dismiss for lack of subject matter jurisdiction at the close of the evidence. Even were that motion regarded as sufficient

under Rule 50(b), which is unlikely, Santa Fe did not join in that motion.

As a result, Santa Fe was precluded from seeking judgment notwithstanding the verdict. Under these circumstances, Santa Fe cannot challenge the sufficiency of the evidence on appeal. *See Trans World Airlines, Inc. v. Shirley*, 295 F.2d 678, 678–79 (9th Cir.1961). Instead, appellate review is limited to Santa Fe's motion for a new trial. *Shipman*, 709 F.2d at 385–86. The district court's denial of the motion for a new trial is reversible only if the record contains no evidence in support of the verdict. *Id.*

The validity of Farley's legal theory presents a question of law that is reviewable de novo. *Western Concrete Structures Co. v. Mitsui & Co. (U.S.A.), Inc.*, 760 F.2d 1013, 1016 (9th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985).

### III

### VIOLATION OF THE SHERMAN ACT

■ Simply stated, Farley's theory is that Santa Fe, ATSF, and the shippers' agents and associations conspired to violate the ICC's minimum tariff regulations. Farley argues that Santa Fe offered Plan V service at an unlawfully low price, thus depriving Farley of business and distorting the structure of the market. Santa Fe argues that its actions may have violated the Interstate Commerce Act, but that those actions did not violate the Sherman Act.

Farley's theory closely resembles predatory pricing. Under ordinary circumstances, Farley's theory would be difficult to sustain in light of the fact that the tariff for the Santa Fe Plan V was above average total cost. *See Transamerica Computer Co. v. International Business Machines Corp.*, 698 F.2d 1377, 1388 (9th Cir.) (holding "that if the challenged prices exceed average total cost, the plaintiff must prove by clear and convincing evidence ... that the defendant's pricing policy was preda-

tory"), *cert. denied,* 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983). . In *Transamerica Computer,* however, we suggested several possible situations in which a cost-based rule would be inappropriate. *Id.* at 1387. Specifically, we stated that factors such as "intent, market power, market structure, and long-run behavior" remained relevant. *Id.*

We recently applied an exception to *Transamerica Computer* in a case involving facts virtually identical to those in the present case. In *Western Concrete Structures Co. v. Mitsui & Co. (U.S.A.), Inc.,* 760 F.2d 1013 (9th Cir.1985), *cert. denied,* ⸱ — U.S. ——, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985), the plaintiff alleged that several companies conspired to import Japanese steel at prices below the legal limit. The district court dismissed the complaint, but we reversed:

> Here, intent to injure VSL's competitors and to drive them out of the market is specifically alleged. Also alleged is the peculiar market structure of the post-tensioning business. It is a protected market, in that steel strand may not lawfully be imported at prices below a fixed price. Domestic concerns cannot lawfully buy imported steel strand below that price and domestic sellers will not sell steel strand below that price. It is alleged that the conspirators arranged to supply VSL with imported steel strand at a price below what VSL's competitors could lawfully pay and that the intended and actual result was to enable VSL to put those competitors, including Western, at a competitive disadvantage, and drive most of them out of the post-tensioning business, including Western as to one part of the market. We hold that these allegations [bring] this case within the exception that we articulated in *Transamerica Computer.* Here, the price cutting was not "pro-competitive" as most price cutting is. Rather, it was intended to be, and was, anti-competitive under the unique conditions of the relevant market.

760 F.2d at 1016. In a separate opinion, Judge Sneed stated the legal theory succinctly:

> The improper conduct alleged in this case is a conspiracy to sell at prices below those that other competitors, acting within the law, could offer. This is no more and no less than a form of predatory pricing. The only difference between the conduct alleged in this case and ordinary predatory pricing is that here it is the law, rather than costs, that prevents the defendant's competitors from matching the defendant's price.

*Id.* at 1020 (Sneed, J., concurring in part).

In light of *Western Concrete,* Santa Fe's argument that Farley has stated only a violation of the Interstate Commerce Act must fail. *Cf. Barnes v. Arden Mayfair, Inc.,* 759 F.2d 676, 679 (9th Cir.1985) (holding that ICC regulation does not bar an antitrust suit for activities "beyond the scope of the ICC's jurisdiction"). Farley has stated a valid cause of action under the Sherman Act.

## IV

### ANTITRUST INJURY AND DAMAGES

#### A. *The Problem of Causation—Antitrust Injury*

■ Santa Fe argues that Farley failed to establish an antitrust injury. In order to recover treble damages under section 4 of the Clayton Act (15 U.S.C. § 15), Farley must establish that its injuries were caused "by reason of" the defendants' *unlawful* competition. *MCI Communications Corp. v. American Telephone & Telegraph Co.,* 708 F.2d 1081, 1161 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983); *see Dolphin Tours, Inc. v. Pacifico Creative Service, Inc.,* 773 F.2d 1506, 1509 (9th Cir.1985). As the Supreme Court set forth in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977):

> Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent

and that flows from that which makes defendants' acts unlawful.

(Emphasis in original).

Farley must establish that the unlawful activities of Santa Fe were a material cause of at least *some* of its injury, rather than the injury being wholly attributable to other factors. *See Dolphin Tours,* 773 F.2d at 1510. The difficulty in this case, as will be outlined further below, is that Farley presented proof of damages in terms of the profit and amount of shipping business they would have achieved "but for" the existence of defendant Santa Fe's Plan V arrangement. Farley did *not* show what damages were attributable to the illegally contracted portion of Santa Fe's Plan V business. Thus the issue of proximate causation is raised before us.

By failing to request a directed verdict at the close of all the evidence, Santa Fe lost its right to challenge the sufficiency of the evidence. Thus the issue before us is whether Farley presented *any* evidence of *some* injury attributable to *unlawful* competition by Santa Fe.

Farley insists the references at trial to "Plan V" were invariably references to the illegal scheme to avoid the ICC-approved tariff rates. Farley seeks to support that assertion by arguing that no "true" Plan V ever existed. To some extent, Farley's assertion is correct. A "true" Plan V arrangement would have been a special joint rail-truck rate, approved by the ICC, which was to be divided between a railroad and a motor carrier. Instead, the Santa Fe Plan V was established under the Rocky Mountain Motor Tariff Bureau, a truck tariff publishing bureau operating under the authority of the ICC. Even though some of the transportation of goods under the Santa Fe Plan V was accomplished through rail transportation, Santa Fe was applying a "pure truck rate" for the full distance. The result was that a legitimate charge made by Santa Fe for its "loose" Plan V arrangement would be even more expensive than a "true" Plan V arrangement, as

the Santa Fe Plan V tariff rate failed to account for the less expensive rail rates generally applied in piggyback shipping.

However, there was nothing illegal about the Santa Fe arrangement on its face. Whether it was a "true" Plan V or a "loose" Plan V, had Santa Fe charged the proper tariff, its conduct would have been perfectly legal. To the extent that the Santa Fe Plan V, by itself, deprived Farley of business, Farley has *not* suffered an antitrust injury. Instead, Farley has suffered antitrust injury *only* to the extent, if any, that Santa Fe's illegal undercutting of the tariff rate caused Farley to lose business.

In addition, Farley argues that as Plan V rates, particularly when actually charged at the truck shipping rate, were higher than Plan IV rates, which Farley offered, the only way Santa Fe could be competitive and gain any business was if all of its shipping business was at the illegitimate lower rate.

As counsel for Santa Fe pointed out at oral argument, comparing Plan V and Plan IV rates is nearly tantamount to comparing apples and oranges. Plan V provided door-to-door service from a shipper's loading dock to the recipient's loading dock. A Plan IV customer paid a lower rate but only received rail service and had to make other arrangements for shipment to and from the railroad yard. In addition, Plan V was more advantageous for those with partial loads as it allowed combination of several loads in a single truck trailer, whereas Plan IV required the customer to provide a fully loaded trailer at the railroad ramp. Plan V also could provide a better rate in some instances for lighter loads as the Plan V rate was based upon the actual weight of a trailer, whereas Plan IV had minimum rates per trailer. Thus, for certain customers, taking all factors into account, it was indeed more economical to utilize Plan V than Plan IV. It is important to note that Santa Fe was not the only carrier to offer the Plan V arrangement, indicating that

there was at least some demand for Plan V service by shippers contracting with legitimately operated carriers. In fact, Farley itself had used Plan V service on limited occasions.

However, upon careful review of the record in this case, we find we cannot attribute all of Santa Fe's burgeoning Plan V business to those shipping customers for whom the arrangement was advantageous. Even though Santa Fe charged higher truck rates, exceeding that even of a "true" Plan V joint truck-rail rate, Santa Fe's rates were so low as to lead Farley's customers to complain about Farley's Plan IV prices in comparison to those of shipping agents doing business with Santa Fe. Some of this rate competition had to be due, at least in some small part, to Santa Fe's deviation from the lawful tariff rates. Indeed, a former Santa Fe employee testified that the purpose of the scheme to falsify the weight and composition of cargo was to arrive at a rate lower than that possible under Plan IV.

In addition, it appears that up to 75 percent of Santa Fe's business was with shipping agents/associations who participated in the illegal scheme, thus infecting a substantial portion of Santa Fe's business with the unlawful deviation from the required tariff rate.[3]

In light of these factors, it is reasonable to conclude that *some* of the business diverted from Farley to shipping agents working with Santa Fe was due to the unlawful competition. Although this is very weak evidence of proximate cause, it provides an adequate demonstration of antitrust injury in this case, particularly in light of Santa Fe's inability to challenge the sufficiency of the evidence on appeal. Under these circumstances, the weaknesses in the evidence on causation instead go to the sufficiency of proof on the amount of damages. *See Dolphin Tours, Inc. v. Pacifico Creative Service, Inc.,* 773 F.2d 1506, 1510–11 (9th Cir.1985).

### B. *Amount of Damages*

■ Santa Fe also argues that Farley failed to produce adequate evidence such that the trier of fact could determine the amount of damages which Farley is entitled to recover without engaging in speculation. Once a plaintiff has established that the activities in violation of the antitrust laws were a material cause of *some* of its injury, the remainder of the damage inquiry is judged under a more lenient amount of damage standard. *Dolphin Tours, Inc.,* 773 F.2d at 1509–10. This court recently offered the following analysis:

> Once the fact of antitrust injury is proven, we have traditionally required a lesser quantum of proof to support the amount of damages. An antitrust plaintiff must simply provide evidence to support a " 'just and reasonable estimate of the damage.' " A jury's finding of the amount of damages must be upheld unless the amount is "grossly excessive or monstrous," clearly not supported by the evidence, or "only based on speculation or guesswork."

*Handgards, Inc. v. Ethicon, Inc.,* 743 F.2d 1282, 1297 (9th Cir.1984) (citations omitted),

---

**3.** Contrary to Farley's assertion, evidence concerning the extent to which Santa Fe's Plan V business was infected by the unlawful deviation from the required tariff is not direct evidence of proximate causation of damages. The fact that a substantial portion of Santa Fe's business involved shipping at unlawful rates does not, in and of itself, demonstrate that the unlawfully low rates caused any diversion of shipping business to those shipping agents dealing with Santa Fe. As discussed above, other legitimate factors can account for lower rates under Santa Fe's Plan V, and certain advantages offered by Plan V's door-to-door service, regardless of the rates charged, can account for the attraction of customers to the Santa Fe Plan V.

However, on this record, we conclude that evidence of the extent to which Santa Fe's business was infected by the unlawful scheme constitutes some cumulative evidence that *some* business likely was diverted from Farley by reason of the unlawfully low rates offered by shipping agents conspiring with Santa Fe in the illegal deviation from the tariff.

cert. denied, —— U.S. ——, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985).

Even under this lenient standard, and even considering Santa Fe's loss of the right to challenge the sufficiency of the evidence by failing to request a directed verdict at the close of all the evidence, we must reverse the judgment as to the amount of damages. Farley has failed to present *any* evidence permitting the jury to parse out which damages are attributable to the unlawful competition.

Farley offered two methods of calculating damages. The first method was based on the testimony of the plaintiffs' officers. Frank Sannebeck, the president of Systems Terminal, Inc., testified that his company received an average net profit of approximately $150.00 per trailer. He also estimated his company's market share to be ten percent. John Farley, the president of Farley Transportation Co. and an officer of Piggyback Trailermate, Inc., also testified that his companies received an average net profit of $150.00 per trailer. John Farley testified that his companies each had a market share of fifteen to twenty percent. The plaintiffs also produced evidence showing that the Santa Fe Plan V diverted approximately 20,000 trailers from other piggyback plans during the relevant time frame.[4] Farley suggests the following calculations:

| Systems Terminal: | 20,000 trailers × 10% market share × $150.00 average profit = $300,000 damages |
| --- | --- |

| Farley Transportation and Piggyback Trailermate: | 20,000 trailers × 30% market share × $150.00 average profit = $900,000 damages |
| --- | --- |

The flaw in this method is that it assumes that all of Santa Fe's Plan V shipping business, or at least all of the newly attracted business, was infected by the unlawful scheme to deviate from the required tariff rates. No evidence was produced showing the number of trailers that were diverted from the plaintiffs because of the illegal price-cutting activities, as opposed to legitimate competition. Accordingly, the jury was required to speculate.

The second method produced by Farley was a study by an economist. Through various projections of the plaintiffs' growth rates and profit margins, Dr. Mosich determined that each of the plaintiffs had suffered reduced gross profits during the relevant time frame. On cross-examination, however, Dr. Mosich admitted that he had merely assumed that the lost profits were due to Santa Fe's illegal activities. He failed to show any nexus between the alleged conspiracy and the damages allegedly suffered by Farley. The Mosich study does not provide a reasonable basis for the calculation of damages by the jury. *See Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1353 (3d Cir.1975) ("In the absence of any guidance in the record, we cannot permit a jury to speculate concerning the amount of losses resulting from unlawful, as opposed to lawful, competition.").

---

4. Farley's calculation of the number of trailers diverted to the Santa Fe Plan V from other piggyback plans was based on a memorandum written by an ATSF representative. This memorandum stated that "60% of SFTT traffic is traffic that would move rail TOFC [by another piggyback plan, such as Plan IV] if the SFTT's service was non-existent." As Santa Fe's Plan V business during the years in question totaled 33,000 trailers, Farley concluded that 19,800, or 60 percent, had been diverted from other piggyback plans. In calculating damages, Farley rounded this figure off to 20,000 trailers.

However, the ATSF memorandum simply is not evidence of what portion of Farley's business consisted of customers attracted by unlawfully low rates. Rather, the 60 percent figure refers to the total shipping business attracted by Santa Fe which would be traveling on a traditional piggyback plan "but for" the very existence of the Santa Fe Plan V, which in itself was not illegal. Indeed, Farley concedes that this memorandum was written by an ATSF representative before the railroad was even aware of the illegal deviation from the tariff. In fact, this memorandum was written concerning piggyback traffic moving during 1977, a year for which Farley is not even seeking damages.

Farley produced no evidence on a critical element of its claim for damages: direct causation. Farley's evidence arguably provides a basis for calculating the profits that were lost due to competition with the Santa Fe Plan V. Because the plaintiffs could have lost customers to the Santa Fe Plan V even in the absence of illegal undercutting of the tariff rate, Farley's evidence was inadequate.

The critical flaw in Farley's theory of damages was the failure to present direct evidence concerning the behavior and motivations of the shipping *customers* —the shippers—as opposed to evidence on the conduct of Santa Fe and various shipping agents. The crucial issue was *why* customers were attracted to the Santa Fe Plan V. More accurately, the issue was why shippers were apparently attracted to shipping agents taking advantage of the Santa Fe Plan V, rather than to other shipping agents, such as Farley, which did not.

The missing link was evidence allowing at least a reasonable inference as to the amount of customer business diverted to Santa Fe Plan V because of, rather than without regard to, lower rates attributable to the illegal scheme to deviate from the tariff. Indeed, little evidence was presented as to whether the savings realized by the shipping agents participating in the unlawful evasion of the tariff rates were actually passed along to customers, rather than simply enhancing the profits of the shipping agents. Any effort to prove that customers were motivated by unlawful lower shipping rates in directing their business to the Santa Fe Plan V would naturally require an initial showing that material savings were in fact provided those customers. The next step, then, would be presentation of evidence that those savings, attributable to the unlawful scheme, were the impetus for the diversion of customer business, instead of some other at-

tractive element of the Santa Fe Plan V approach to piggyback shipping.

Farley presented some evidence concerning the extent to which Santa Fe's Plan V business was infected with the illegal scheme, and some evidence on the total amount of customer business attracted to the Santa Fe Plan V arrangement. Farley did not present direct evidence on the portion of that diverted business attributable solely to the illegal scheme.

In sum, although Farley produced evidence it had suffered *some* injury due to Santa Fe's antitrust violation, Farley provided *no* evidence on the *amount* of damages attributable only to the unlawful conduct. Farley's utter failure to make any segregation between damages attributable to lawful competition and that attributable to the unlawful scheme to deviate from the tariff rate requires reversal of the verdict and remand for a new trial on the amount of damages.[5] *See MCI Communications Corp. v. American Telephone & Telegraph Co.,* 708 F.2d 1081, 1161–66 (7th Cir.) (overturning a damages award based on a study that did not isolate the damages caused by the defendant's illegal actions and that contained flawed assumptions), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

5. Since we remand this case for a partial new trial on the issue of damages, we need not review the district court's award of attorneys' fees.