**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAREK MOLSKI; DISABILITY RIGHTS
ENFORCEMENT, EDUCATION SERVICES:
HELPING YOU HELP OTHERS
("DREES"),
              *Plaintiffs-Appellants,*

              v.

M.J. CABLE, INC., a California
corporation, d/b/a CABLE'S
RESTAURANT,
              *Defendant-Appellee.*

No. 05-55347

D.C. No.
CV-03-04809-DT

OPINION

Appeal from the United States District Court
for the Central District of California
Dickran M. Tevrizian, District Judge, Presiding

Argued and Submitted
February 5, 2007—Pasadena, California

Filed March 23, 2007

Before: Warren J. Ferguson, Eugene E. Siler, Jr.,* and
Michael Daly Hawkins, Circuit Judges.

Opinion by Judge Ferguson

---

*The Honorable Eugene E. Siler, Jr., Senior United States Circuit Judge
for the Sixth Circuit, sitting by designation.

**COUNSEL**

Thomas E. Frankovich and Jessica A. Dayton, Thomas E. Frankovich, A Professional Law Corporation, San Francisco, California, for the plaintiffs-appellants.

Craig N. Beardsley, Jones & Beardsley, Bakersfield, California, for the defendant-appellee.

**OPINION**

FERGUSON, Circuit Judge:

Jarek Molski ("Molski") appeals the District Court's denial of his motion for a new trial following a jury verdict in favor of M.J. Cable Inc., owner of Cable's Restaurant ("Cable's"). Molski, who is paraplegic, sued Cable's for violations of the Americans with Disabilities Act ("ADA") and California's Unruh Civil Rights Act ("Unruh Act"), alleging that Cable's failed to accommodate the disabled. Although Molski provided uncontradicted evidence that Cable's did not identify and remove architectural barriers, the jury returned a verdict for the restaurant. The District Court denied Molski's motion for a new trial, speculating that the jury could have reasonably concluded that because of Molski's record of litigiousness, he was a "business" and not an "individual" entitled to the ADA's protections. We reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

Molski is a paraplegic who has been confined to a wheelchair since a motorcycle accident paralyzed him at the age of 18. Considered by some to be a controversial figure, Molski has brought hundreds of lawsuits against inaccessible public accommodations throughout California. Molski considers himself a civil rights activist who uses litigation to force com-

pliance with the ADA; California businesses and a federal district court consider him a vexatious litigant who exploits the ADA and its state law counterpart for pecuniary gain.[1]

On January 26, 2003, Molski took his grandmother to church, then to lunch at Cable's Restaurant in Woodland Hills, California, where he spent thirty-five dollars on their meal. After eating lunch, Molski excused himself to use the restaurant's public restroom.

Upon entering the restroom, Molski noticed numerous architectural barriers to his accessing the facilities. The door pressure on the bathroom door was too heavy, and the door lacked a handicap accessible sign. Inside, the stall doors could not close with Molski's wheelchair in the stall. The stall lacked grab bars on both the rear wall and side wall, which prevented Molski from maneuvering from his wheelchair to the toilet. The toilet seat cover dispenser was unreachable. The pipes underneath the sink were not insulated, and therefore, according to Molski, posed a special risk to those without feeling in their legs, as hot pipes could burn them without their realization. The sink also lacked levered hardware, a type of fixture that is easily moveable without strong grip strength. Molski was unable to reach at least one of the paper towel dispensers. Molski testified that the hygienic violations were especially important in his case because, due to his chest-down paralysis, he uses a catheter and a urine bag that must be emptied frequently. He explained that failure to

---

[1]*Molski v. Mandarin Touch Restaurant*, 347 F. Supp. 2d 860 (C.D. Cal. 2004) (declaring Molski a vexatious litigant and requiring court approval prior to his filing future lawsuits); *see also* Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 7, 34 (2006) (defending serial ADA litigation as "essential" but identifying prior allegations of ethical violations by Molski's attorney); Carri Becker, *Private Enforcement of the Americans with Disabilities Act via Serial Litigation: Abusive or Commendable?*, 17 Hastings Women's L.J. 93 (2006) (using Molski as case study of serial litigation under Title III of the ADA).

empty the urine bag can cause autonomic dysreflexia, a condition that can result in whole body spasms and even cardiac arrest. Handling the bag with unwashed hands can also lead to bladder infections.

On March 7, 2003, Rick Sarantschin ("Sarantschin"), the principal of Access Investigation Monitoring, conducted an inspection of Cable's and confirmed Molski's observations using the ADA Accessibility Guidelines for Buildings and Facilities ("ADAAG"). *See* 28 C.F.R. § 36 App. A. Four months later, Molski brought a lawsuit against Cable's in the Central District of California, alleging violations of the ADA and state laws. The District Court held a three-day trial.

At trial, Molski, Sarantschin, and construction expert Michael Beall ("Beall") testified on behalf of Molski, and Cable's vice president Anthony Dalkas ("Dalkas") testified as an adverse witness. Molski testified primarily about his experience at Cable's, his prior lawsuits, and his views on disability access discrimination. Sarantschin testified about his investigation of Cable's and the ADA violations he observed.

Beall testified about the construction costs of making Cable's compliant with the ADA. He estimated that the approximate total cost to remodel both the men's and women's bathrooms would be $8,600, or $6,000 for just the men's bathroom. Beall noted that incremental steps were even cheaper: lowering the toilet seat cover dispenser would cost $20 and take about 15 minutes; insulating the pipes would cost under $20 and take "about a minute and a half to do." Other repairs were as inexpensive as $30.

In his testimony, Dalkas acknowledged that the company had not attempted to identify barriers to the disabled. He admitted that Cable's had not made the renovations because "[w]e weren't compelled to do it." Dalkas testified that Cable's could afford each of the repairs but stated, "once you start down that path[,] you're opening a can of worms that

will cost a lot of money." Dalkas described issues with Cable's landlord, as well as the economic costs of remodeling, such as the need to close the restaurant during renovations. Dalkas said he had received estimates of $40,000 to "bring the two bathrooms up to the current [c]ode," although Cable's had not disclosed any such remodeling bids during discovery.

The defendant did not call any witnesses, but relied primarily on its cross-examination of Molski and Dalkas. In essence, the defendant's strategy was to discredit Molski by exposing an ulterior motive for bringing suit: Molski and his lawyer Thomas Frankovich ("Frankovich") were purportedly in the business of tracking down public accommodations with ADA violations and extorting settlements out of them. On cross examination, Molski acknowledged that: he did not complain to any of Cable's employees about his access problems; he had filed 374 similar ADA lawsuits as of October 8, 2004; Frankovich had filed 232 of the 374 lawsuits; even more lawsuits had been filed since that date; Molski and Frankovich averaged $4,000 for each case that settled; Molski did not pay any fees to Frankovich; Molski maintained no employment besides prosecuting ADA cases, despite his possession of a law degree; Molski's projected annual income from settlements was $800,000;[2] Molski executed blank verification forms for Frankovich to submit with responses to interrogatories; they had also filed lawsuits against two other restaurants owned by Cable's; they had filed a lawsuit against a nearby restaurant; and Sarantschin obtained up to 95% of his income from Frankovich's firm for performing investigations for ADA lawsuits.[3]

---

[2]The method used to calculate this number was questionable. It assumed that Molski had no litigation expenses, that he obtained a $4,000 settlement from each case filed (rather than each case settled), that Molski would settle two hundred cases every year, and that all proceeds went to Molski.

[3]It is unclear why this evidence was admitted by the trial court under Fed. R. Evid. 401. The narrow issue in the case was whether Cable's

During closing arguments, Molski focused primarily on the ADA violations, and Cable's focused primarily on Molski. The Court instructed the jury on, *inter alia*, the elements of an ADA claim, and gave it a Special Verdict Form. The jury returned a verdict for Cable's, responding "No" to the threshold question: "Do you find that the defendant failed to identify and remove architectural barriers at Cable's restaurant?"

Pursuant to Rule 59(a) of the Federal Rules of Civil Procedure, Molski moved for a new trial on the grounds that the verdict was against the weight of the evidence. The District Court denied the motion. Molski timely appealed.

## *DISCUSSION*

### A.  *Standard of Review*

We review a district court's denial of a motion for a new trial under Federal Rule of Civil Procedure 59(a) for an abuse of discretion. *Dorn v. Burlington N. Santa Fe R.R. Co.*, 397 F.3d 1183, 1189 (9th Cir. 2005); *see also Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999) (applying abuse of discretion standard where the motion for a new trial was "grounded on the assertion that the jury's verdict was against the clear weight of evidence").

"The district court's denial of the motion for a new trial is reversible only if the record contains no evidence in support of the verdict." *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 786 F.2d 1342, 1347 (9th Cir. 1985). We may reverse the denial of the motion where the District Court has "made a mistake of law." 12 James Wm. Moore et al., *Moore's Federal Practice* § 59.54 (3d ed. 2006).

---

failed to identify and remove architectural barriers. Although some of the above facts may be admissible witness impeachment evidence, most appear to be irrelevant or at least far more prejudicial than probative. *See* Fed. R. Evid. 403. However, because these evidentiary questions are not before us on appeal, we do not address them here.

### B. *Rule 59(a)*

**[1]** Rule 59(a) states, "A new trial may be granted . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R. Civ. P. 59(a)(1).**[4]** As this circuit has noted, "Rule 59 does not specify the grounds on which a motion for a new trial may be granted." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). Rather, the court is "bound by those grounds that have been historically recognized." *Id.* Historically recognized grounds include, but are not limited to, claims "that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940). We have held that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice." *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000).

Upon the Rule 59 motion of the party against whom a verdict has been returned, the district court has "the duty . . . to weigh the evidence as [the court] saw it, and to set aside the verdict of the jury, even though supported by substantial evidence, where, in [the court's] conscientious opinion, the verdict is contrary to the clear weight of the evidence." *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990)

---

**[4]**Rule 59(a) establishes a different standard for bench trials than for jury trials. "[I]n an action tried without a jury, [a new trial may be granted] for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States." Fed. R. Civ. P. 59(a)(2). The District Court applied the standard from *Brown v. Wright*, 588 F.2d 708, 710 (9th Cir. 1978), a bench trial case establishing the standard under Fed. R. Civ. P. 59(a)(2), despite the fact that Molski's case was tried to a jury. This error does not affect our analysis.

(quoting *Moist Cold Refrigerator Co. v. Lou Johnson Co.*, 249 F.2d 246, 256 (9th Cir. 1957)).

**[2]** Because determining "the clear weight of the evidence" is a fact-specific endeavor, appeals courts are reluctant to second-guess district courts' conclusions. An appellate court generally will not reverse the denial of a new trial motion if there was some "reasonable basis" for the jury's verdict. *Mitchell v. Boelcke*, 440 F.3d 300, 305 (6th Cir. 2006); *Collado v. UPS*, 419 F.3d 1143, 1155 (11th Cir. 2005); *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004); *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003); *Colasanto v. Life Ins. Co. of N. Am.*, 100 F.3d 203, 212 (1st Cir. 1996); *Nissim v. McNeil Consumer Prods. Co.*, 957 F. Supp. 600, 602-04 (E.D. Pa. 1997), *aff'd without opinion*, 135 F.3d 765 (3d Cir. 1997). If there is no reasonable basis, however, "the absolute absence of evidence to support the jury's verdict makes [refusal to grant a new trial] an error in law." *Urti v. Transp. Commercial Corp.*, 479 F.2d 766, 769 (5th Cir. 1973) (quoting *Indamer Corp. v. Crandon*, 217 F.2d 391, 393 (5th Cir. 1954)); *see also Hiltgen v. Sumrall*, 47 F.3d 695, 703 (5th Cir. 1995) (applying "absolute absence of evidence" standard); *Jones v. City of St. Clair*, 804 F.2d 478, 480 (8th Cir. 1986) (same); *Grandison v. Smith*, 779 F.2d 637, 640 (11th Cir. 1986) (same).

## C.   *Americans with Disabilities Act*

**[3]** Congress passed the ADA, 42 U.S.C. § 12101 *et seq.*, in 1990 "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." § 12101(b)(2). Title III of the ADA prohibits discrimination by public accommodations. § 12181 *et seq.* Title III provides, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place

of public accommodation." § 12182(a). Discrimination includes "a failure to remove architectural barriers . . . in existing facilities . . . where such removal is readily achievable." § 12182(b)(2)(A)(iv). Readily achievable means "easily accomplishable and able to be carried out without much difficulty or expense." § 12181(9).

Federal regulations clarify which barrier removals are likely to be readily achievable and provide examples in 28 C.F.R. § 36.304. They include installing grab bars in toilet stalls, rearranging toilet partitions to increase maneuvering space, insulating lavatory pipes under sinks to prevent burns, installing raised toilet seats, installing full-length bathroom mirrors, and repositioning paper towel dispensers. 28 C.F.R. § 36.304(b)(12)-(17). The Department of Justice has referred to these examples as "the types of modest measures that may be taken to remove barriers and that are likely to be readily achievable." Appendix B to Part 36 — Preamble to Regulation on Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed. Reg. 35,546 (July 26, 1991); *see also* 28 C.F.R. § 36 App. A.

**[4]** To prevail on a Title III discrimination claim, the plaintiff must show that (1) she is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the defendant because of her disability. 42 U.S.C. §§ 12182(a)-(b); *see Parr v. L & L Drive-Inn Restaurant*, 96 F. Supp. 2d 1065, 1085 (D. Haw. 2000); *Dunlap v. Ass'n of Bay Area Gov'ts*, 996 F. Supp. 962, 965 (N.D. Cal. 1998); *see also Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1077 (8th Cir. 2006) (applying similar test in higher education context).

Aggrieved individuals or the Attorney General may enforce the ADA. 42 U.S.C. § 12188. Private parties may utilize the remedies and procedures made available by the Civil Rights Act of 1964. § 12188(a)(1) (citing § 2000a-3(a)). In particu-

lar, they may obtain injunctive relief against public accommodations with architectural barriers, including "an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities." § 12188(a)(2). In suits brought by the Attorney General, courts may grant both equitable relief and monetary damages. § 12188(b)(2). Monetary damages are not available in private suits under Title III of the ADA, *Wander v. Kaus*, 304 F.3d 856, 858 (9th Cir. 2002), but the ADA gives courts the discretion to award attorney's fees to prevailing parties. 42 U.S.C. § 12205.

## D.   *California's Unruh Civil Rights Act*

**[5]** In the disability context, California's Unruh Civil Rights Act operates virtually identically to the ADA. It states,

> All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever.

Cal. Civ. Code § 51(b). Any violation of the ADA necessarily constitutes a violation of the Unruh Act. § 51(f).

The Unruh Act, however, does allow for monetary damages. Victims of discrimination may obtain actual damages, as well as "any amount that may be determined by a jury . . . up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars." § 52(a). The litigant need not prove she suffered actual damages to recover the independent statutory damages of $4,000. *Botosan v. Paul McNally Realty*, 216 F.3d 827, 835 (9th Cir. 2000). The Unruh Act also allows for attorney's fees. Cal. Civ. Code § 52(a).

Because the Unruh Act is coextensive with the ADA and allows for monetary damages, litigants in federal court in California often pair state Unruh Act claims with federal ADA claims. *Molski v. Mandarin Touch Restaurant*, 347 F. Supp. 2d at 862-63.

### E.  *Analysis*

The issue in this case is whether the District Court abused its discretion when it denied Molski's motion for a new trial. The first question is whether there was an absence of evidence to support the jury's conclusion that "defendant[s did not] fail[ ] to identify and remove architectural barriers at Cable's Restaurant." The second question is whether the District Court's explanation of the verdict, that Molski was a business and not an individual, somehow justifies the jury's conclusion.

*1.   There is no evidence to support the jury's conclusion that Cable's did not fail to identify and remove architectural barriers.*

The District Court structured the Special Verdict Form to track the elements of a Title III claim. First, as a threshold question, it asked, "Do you find that the defendant failed to identify and remove architectural barriers at Cable's Restaurant?" The form then instructed the jury, if it answered "yes," to answer three questions for each of the purported violations: "(1) Did this barrier exist at the Cable's Restaurant on January 26, 2003? (2) If 'yes,' did defendant M.J. Cable fail to identify and remove the barrier? (3) If 'yes,' was it readily achievable to remove?" After these questions, the form asked, "Should plaintiff be awarded statutory damages in the sum of $4,000?" The jury answered "no" to the first question and therefore did not go on to answer any of the subsequent questions.

**[6]** Reviewing the trial transcript, "the record contains no evidence in support of the verdict." *Farley Transp. Co.*, 786 F.2d at 1347. The testimony of Molski and Sarantschin established a laundry list of architectural barriers, including: the absence of accessibility signage, excessive door pressure, stalls that were neither wide enough nor long enough, the absence of side and rear grab bars, the absence of looped handles for opening or closing the stall door, no sliding lock, no automatic door opener, a toilet seat cover dispenser that was too high, a paper towel dispenser that was too high, a height-compliant paper towel dispenser that was blocked by a sink, sinks without levered hardware, no insulation on the pipes, urinals that were too close and too high, stall doors that were too narrow, and toilets that were too short.[5]

**[7]** Dalkas, the vice president of Cable's, acknowledged the continued existence of these violations and flatly admitted that neither he nor anyone else at Cable's had attempted to identify or remove architectural barriers.

**[8]** The only issue about which there was any disagreement was whether or not the removal of the barriers was "readily achievable."[6] 42 U.S.C. § 12182(b)(2)(A)(iv). This issue is separate from whether Cable's identified and removed the barriers. The Special Verdict Form specifically distinguished those questions, allowing the jury to find initially that Cable's

---

[5]"The issues involved [in ADA accessibility cases] are, to be frank, mind-numbingly boring; the ADA Accessibility Guidelines regulate design elements down to the minutest detail. . . . [But, a]lthough the ADA's requirements are highly technical, they are essential to serve a core function of all civil rights laws: ensuring that the arenas of civic life are open to everyone." Bagenstos, *supra*, at 23-24.

[6]Federal regulations provide examples of removals of barriers that are readily achievable. 28 C.F.R. § 36.304(b)(12)-(17). We express no opinion as to whether, given these regulations, the "readily achievable" dispute raises a genuine issue of material fact on remand. *See* Fed. R. Civ. P. 56(c).

had failed to identify or remove the barriers, but then that removal was not readily achievable. It did not do so.

**[9]** The jury's determination, in response to the threshold question, that Cable's had not failed to identify and remove barriers was against the clear weight of the evidence, given the undisputed testimony from both Molski and Dalkas. Accordingly, the District Court abused its discretion in denying Molski's motion for a new trial.

*2.    The District Court's explanation of the verdict does not justify the jury's conclusion.*

In denying Molski's motion, the District Court accepted the defendant's "reasonable explanation for the jury's verdict: the jury determined that Molski was not an 'individual' under the ADA, and therefore could not recover against Defendants." This conclusion is unreasonable and legally flawed.

First, the District Court's explanation is inconsistent with the plain language, structure, and spirit of the ADA. Neither the District Court nor the defendant provide any support for concluding that a person may be considered a business and not an individual because of a history of litigiousness.

**[10]** Title III of the ADA protects "individuals" who are disabled. 42 U.S.C. § 12182(a). It is clear that Molski, who is paraplegic, falls within that term. "Statutory interpretation begins with the plain meaning of the statute's language. Where the statutory language is clear and consistent with the statutory scheme at issue, the plain language of the statute is conclusive and the judicial inquiry is at an end." *Botosan*, 216 F.3d at 831 (citations omitted); *see also BP Am. Prod. Co. v. Burton*, 127 S. Ct. 638, 643 (2006) ("Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.").

The defendant, citing 42 U.S.C. § 12182(b)(1)(A)(iv), contends that the ADA defines individuals as referring only "to

the clients and customers of the covered public accommodation." This argument is unavailing for two reasons: first, it misinterprets the relevant provision of the ADA; second, even if its interpretation of the statute were correct, as a factual matter, it does not exclude Molski.

**[11]** First, § 12182(b)(1)(A)(iv), which defines "individuals" as "clients or customers," applies only "[f]or purposes of clauses (i) through (iii) of . . . subparagraph [(b)(1)(A)]." § 12182(b)(1)(A)(iv); *see also PGA Tour v. Martin*, 532 U.S. 661, 678-79 (2001). Sections (i) through (iii) of subparagraph (b)(1)(A) generally prohibit public accommodations from denying participation to the disabled, providing disabled participants an unequal benefit, or providing disabled participants a separate benefit. § 12182(b)(1)(A)(i)-(iii). However, it is subsection (a), not subsection (b), that provides the general prohibition against discrimination on the basis of disability. § 12182(a). As the Supreme Court has pointed out, "clause (iv) [of subparagraph (b)(1)(A)] is not literally applicable to Title III's general rule [in subsection (a)] prohibiting discrimination against disabled individuals. Title III's broad general rule contains no express 'clients or customers' limitation . . . ." *Martin*, 532 U.S. at 679. Aside from being inapplicable to subsection (a)'s general prohibition, the limited definition of "individual" in § 12182(b)(1)(A)(iv) is also inapplicable to § 12182(b)(2)(A)(iv), which defines discrimination to include the failure to remove architectural barriers.

**[12]** This interpretation is in accord with at least one other circuit. In *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 122 (3d Cir. 1998), the Third Circuit held that Title III applied to a medical doctor working as an independent contractor at a hospital, despite the fact that he was neither a client nor a customer, nor even a member of the general public. The court concluded that "both the language of Title III and its legislative history clearly demonstrate [that] the phrase 'clients or customers,' which only appears in 42 U.S.C. § 12182(b)(1)(A)(iv), is not a general circumscription of Title

III and cannot serve to limit the broad rule announced in 42 U.S.C. § 12182(a)." *Id.* at 121. Rather, the court noted, "[t]he operative rule announced in Title III speaks not in terms of 'guests,' 'patrons,' 'clients,' 'customers,' or 'members of the public,' but instead broadly uses the word 'individuals.' " *Id.*

**[13]** Accordingly, Molski did not need to have been a client or customer of Cable's to be an "individual" entitled to the protections of Title III. One need not be a client or customer of a public accommodation to feel the sting of its discrimination.[7]

**[14]** But even if the defendant's reading of the ADA were proper, it would not exclude Molski. Molski was plainly a "customer" of Cable's Restaurant. He brought a guest to the restaurant, ordered food, ate it, paid thirty-five dollars for it, tried to use the restroom, and left. He even returned the day before the trial for some ice cream.[8] In *Martin*, the Supreme Court held that a one-time payment is sufficient to make a disabled person a client or customer of a public accommodation. 532 U.S. at 679-80 (holding that professional golfer was a client or customer of a golf tour because he paid a one-time qualifying fee).

**[15]** Even assuming it would have been a viable legal theory for Molski to have been a business and not an individual, the jury instructions provide no basis for making such a find-

---

[7]*See, e.g.*, Bagenstos, *supra*, at 26-27 ("The [ADA] guarantees people with disabilities the right to choose stores and restaurants from the same array of options as people without disabilities, and one business's violation deprives a person with a disability of that opportunity to choose, even if at the end of the day she would not have decided to patronize that store.")

[8]The defendant's analogy that "[Molski] was no more a customer at [Cable's] on that day than he would be had he been sitting at the counter waiting for the restaurant's cashier to turn his or her back so [Molski] could steal the money from the cash register" is simply wrong, not to mention puzzlingly insensitive in its imagery, given that Molski is confined to a wheelchair.

ing. Cable's did not put forth any evidence that Molski was incorporated, paid salaries, advertised, held himself out as a business, or conducted any activities that could make him a business as a matter of law. In fact, the Joint Pre-Trial Conference Order identifies the plaintiff as "JAREK MOLSKI, *an individual*" and states as an "admitted fact" that "Plaintiff Jarek Molski is a person with disabilities as defined by the ADA." The jury could not have then come to the opposite conclusion.

The jury instructions do not give any support to the District Court's explanation of the verdict, either. The jury was never instructed on the Molski-as-business theory. Although the District Court gave the jury definitions for "disability," "major life activities," "public accommodation," "denial of access," "architectural barrier," and "readily achievable," it never discussed the possibility that Molski was not an "individual" under the ADA, nor did it provide any definition of that term.

**[16]** Finally, the test provided in the jury instructions stated only the following requirements for finding an ADA violation: (1) that Molski be disabled, (2) that Cable's be a public accommodation, and (3) that "Plaintiff was denied access to elements of the Defendants' public accommodation due to Defendants' failure to remove architectural barriers." The parties stipulated to the first two elements, and Molski unequivocally proved the third. The jury instructions therefore provide no support for the District Court's speculation that the jury concluded that Molski was not an individual.

## *CONCLUSION*

**[17]** We conclude that the record provides no evidence whatsoever for the jury's verdict. The District Court abused its discretion in denying Molski's motion for a new trial. Accordingly, we reverse the District Court's denial of the motion, vacate the judgment against Molski, including that for

incurred costs, and remand for a new trial. Costs on appeal are awarded to appellant.

**REVERSED; VACATED and REMANDED.**