**In re ALUMINUM PHOSPHIDE ANTITRUST LITIGATION.**

**This Document Relates To All Actions.**

**Civ. A. No. 93–2452–KHV.**

United States District Court,
D. Kansas.

Sept. 8, 1995.

Order Granting Reconsideration
Oct. 17, 1995.

1458

Deborah Farrar Quirk, Kansas City, MO, Thomas H. Brill, Mission Hills, KS, Joel C. Meredith, Krishna Narine, Meredith, Cohen & Greenfogel, P.C., Philadelphia, PA, Vernon

N. Reaser, Jr., Reaser & Wall, Victoria, TX, Issac L. Diel, Leawood, KS, for National Bugmobiles, Inc., on behalf of itself and all others similarly situated.

Edmund S. Gross, Farmland Industries, Inc., Kansas City, MO, Alvin D. Shapiro, Law Offices of Alvin D. Shapiro, Kansas City, MO, for Farmland Industries, Inc.

David E. Everson, Jr., Tammy L. Womack, Stinson, Mag & Fizzell, Kansas City, MO, Nancy L. Heilman, Cohen & Grigsby, Pittsburgh, PA, for Pestcon Systems Inc., Degesch America, Inc.

Eric D. Braverman, Employers Reinsurance Corporation, Overland Park, KS, A. Bradley Bodamer, Morrison & Hecker, Overland Park, KS, James E. Wright, III, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, for Bernardo Chemicals Ltd., Inc., United Phosphorus, Ltd., Christina S. Bernardo.

Floyd R. Finch, Jr., Katharine S. Bunn, Jeffrey J. Simon, Sally B. Surridge, Brian J. McGrath, James R. Ward, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, MO, Tessa K. Jacob, Blackwell, Sanders, Matheny, Weary & Lombardi, Overland Park, KS, for Inventa Corp.

G. Stanton Masters, James L. Eisenbrandt, Bryan Cave, Overland Park, KS, Nancy L. Heilman, Cohen & Grigsby, Pittsburgh, PA, for Detia–Degesch, GMBH.

David E. Everson, Jr., Tammy L. Womack, Stinson, Mag and Fizzell, Kansas City, MO, G. Stanton Masters, James L. Eisenbrandt, Bryan Cave, Overland Park, KS, Nancy L. Heilman, Cohen & Grigsby, Pittsburgh, PA, for Detia Freyberg, GMBH.

Eric D. Braverman, Employers Reinsurance Corp., Overland Park, KS, A. Bradley Bodamer, Morrison & Hecker, Overland Park, KS, for Casa Bernardo Ltd.

Thomas M. Bradshaw, Dianne M. Hansen, Armstrong, Teasdale, Schlafly & Davis, Kansas City, MO, James R. Hobbs, Marilyn B. Keller, Wyrsch, Atwell, Mirakian, Lee & Hobbs, Kansas City, MO, for McShares Inc., dba Research Products Company.

Edmund S. Gross, Farmland Industries, Inc., Kansas City, MO, Alvin D. Shapiro, Law Offices of Alvin D. Shapiro, Kansas City, MO, for Farmland Industries, Inc.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

This matter comes before the Court on *Defendant McShares, Inc.'s Separate Motion for Summary Judgment* (Doc. # 394), filed April 10, 1995; the *Motion for Summary Judgment of Defendants United Phosphorus, Ltd., and Inventa Corporation* (Doc. # 400), filed April 10, 1995; the *Motion of Defendants Degesch America, Inc., Pestcon Systems, Inc., Detia Degesch GmbH and Detia Freyberg GmbH for Partial Summary Judgment* (Doc. # 405), filed April 10, 1995; and the *Motion of Defendant McShares, Inc. for Partial Summary Judgment* (Doc. # 418), filed April 21, 1995. For the following reasons, and for the reasons stated on the record at the status conference on August 30, 1995, the Court finds that said motions should be sustained with respect to plaintiffs' claims for damages based on sales of cases of aluminum phosphide products outside of 1990, and overruled with respect to plaintiffs' claims for damages based on sales of cases of aluminum phosphide products in 1990. Because an additional memorandum of the Court's reasoning will follow, the Court indulges in only a few brief comments on plaintiffs' new theory with respect to the "fact of injury."

On June 27, 1995, the Court entered its *Memorandum and Order* (Doc. # 498) with respect to *Defendants' Joint Motion in Limine to Exclude Dr. Richard C. Hoyt's Testimony and Expert Report From this Case* (Doc. # 443), filed May 5, 1995. In that order, the Court concluded that Dr. Hoyt had not shown that his "before and after" model, as applied in this case, accounted for undisputed increases in competition between the conspiratorial and normative periods; that Dr. Hoyt had not justified his constant cost industry assumption or his application of individual benchmark prices for each defendant and that Dr. Hoyt had not through proper scientific method established that the difference between prices in the normative and conspiratorial periods was attributable to defendants' alleged conspiracy, to the exclusion of other relevant factors. Because Dr. Hoyt's opinion was based on unjustified assumptions and did not account for changes in

relevant market conditions, the Court held that it would not assist a trier of fact in determining the fact or amount of plaintiffs' damages. Moreover, the Court concluded that in the foregoing respects, Dr. Hoyt's opinion was economically unreliable and thus inadmissible under Rule 702, and that any minimum probative value of his opinion would be substantially outweighed by the danger of unfair prejudice resulting from his unsupported assumptions.

In evaluating the consequences of this ruling, the Court recognized the apparent anomaly of its holding: that without Dr. Hoyt's opinion, plaintiffs might be stripped of their ability to recover substantial actual damages from admitted conspirators. In response to defendants' motions for summary judgment on this issue, plaintiffs propose to rectify the problem through the use of non-expert testimony that in 1988 and 1989 the competitive wholesale price of aluminum phosphide to distributors was "at least $340.00." *See Plaintiffs' Response to Supplemental Memorandum of Defendants Degesch America, Pestcon, Detia Degesch and Detia Freyberg in Support of Their Motions for Summary Judgment* (Doc. # 518), filed August 23, 1995. Specifically, plaintiffs claim that from the statements of two defendants at separate meetings in 1988 and 1989, respectively, a jury could reasonably infer that defendants' estimated competitive wholesale price, absent the alleged conspiracy, was at least $340.00.

Plaintiffs argue that this evidence creates a genuine issue of material fact with respect to whether defendants' conspiracy injured plaintiffs from January 1, 1988 through December 31, 1992. *See Farley Transp. Co., Inc. v. Santa Fe Trail Transp. Co.,* 786 F.2d 1342, 1348 (9th Cir.1985). Plaintiffs further contend that from such evidence, the jury could determine by just and reasonable estimate the amount of plaintiffs' damages, see *MCI Communications Corp. v. American Tel. & Tel. Co.,* 708 F.2d 1081, 1161 (7th Cir.), *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983).[1]

*Summary Judgment Standard*

Antitrust plaintiffs must prove that their injuries were caused by the unlawful acts of defendants. *MCI Communications,* 708 F.2d at 1161. In doing so, plaintiffs must establish that defendants' unlawful activities were a material cause of at least some of their injury, rather than the injury being wholly attributable to other factors. *Farley Transportation,* 786 F.2d at 1349. Once plaintiffs have established causation of damages, the jury may determine the amount of damages by a just and reasonable estimate, as long as the jury verdict is not the product of speculation or guesswork. *MCI Communications,* 708 F.2d at 1161 (citing *J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 566–67, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981) and *Zenith Radio Corp. v. Hazeltine Research Inc.,* 395 U.S. 100, 123–34, 89 S.Ct. 1562, 1576–83, 23 L.Ed.2d 129 (1969)).

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1538–39 (10th Cir.1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law," *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2511, and a "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. at 2512.

The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Hicks v. Watonga,* 942 F.2d 737, 743 (10th Cir.1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated, Inc.,* 912

---

1. Plaintiffs insist that either Dr. Hoyt or one of the plaintiffs could plug the $340.00 figure into an existing computer database to come up with an exact amount of damages approximating $2,000,000.00 for all class members.

F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991).

 Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. at 2511. "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 793 (10th Cir.1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2511–12. Ever mindful of these summary judgment standards, we now turn to the merits of plaintiffs' argument.

### Plaintiffs' Evidence that $340.00 is a "Competitive Price"

Plaintiffs claim that because $340.00 per case is the figure which defendants "bantered about . . . in their numerous meetings," the competitive price for distributors (as opposed to end-use consumers) was "at least as low" as $340.00 per case.[2] In support of their claim, plaintiffs cite evidence of two meetings, in 1988 and 1989 respectively.[3]

On May 6, 1988, Jim Allen (McShares) met with Jerry Sullivan (Degesch America) and Dr. Schaper, Hans–Ulrich Kleist, Alfred Messmer, Rolf Geiss and Franciscus Krahan (all representatives of the German companies). According to Allen's notes of the meeting, the parties discussed the price at which the Amphos limited partnership would sell technical (raw) aluminum phosphide to Degesch America, and the price at which Degesch America distributors needed to buy, in order to successfully compete in then current market conditions. Plaintiffs' Exhibit 26, p. 6. More specifically, according to Allen, Krahan asked Sullivan, "At what price do you have to sell to the distribution to let them compete?" According to Allen, Sullivan reported $340.00 per case.

Almost a year later, on April 24, 1989, Sullivan (Degesch America) told Detia Degesch that Degesch America had decided that it was not *possible* to lower its prices to distributors · and that he planned to talk to Allen (McShares) and others to seek "alternative remedies." On May 8, 1989, Sullivan (Degesch America) and Allen (McShares) met in Mexico City with Orlando Bernardo and Flavio Simoes (both of Casa Bernardo). Bernardo's notes from the meeting reflect that "[Degesch America and McShares] asked what would be the minimum price for the distributor and we answered 340." Plaintiffs' Exhibit 35. Bernardo also reported that he and Simoes asked Sullivan and Allen what their ideal price was and they answered $425.00. Flavio Simoes explained the gist of this conversation as follows:

Q: What was discussed in Mexico City?

A: Several subjects. One of the subjects was EPA tests that they are requesting for the companies; that's going to cost a lot of money to the company to provide this test to EPA. The other subject was price, but we don't get in agreement at this meeting because the people that have power to decide something was not present. Only Mr. Orlando Bernardo that have power to decide that was present there.

\* \* \* \* \* \*

It was—during the meeting it was suggest—suggestions for 340 dollars per

---

**2.** Plaintiffs do not propose a specific "competitive" price for end-users. At the status conference on August 30, 1995, counsel for plaintiffs suggested that the competitive price for end-users could be determined by looking at what price defendants charged end-users at the point · in time when defendants charged distributors $340.00. Counsel gave no indication what such evidence would reveal, or how such calculations might be employed to defeat defendants' request for summary judgment, *i.e.*, whether such calcu-

lations would prove or disprove fact of injury as to any or all of the alleged conspirators at any given period of time.

**3.** Plaintiffs have been less than thorough in developing the factual record with respect to their argument, and the Court has therefore scoured the record for relevant evidence on this issue. The Court was not obliged to perform this task and if relevant evidence remains unexamined, the responsibility is that of plaintiffs.

case for to pay all the tests of EPA that EPA requesting and the insurance, too, that was higher and higher and higher because the legal expense of the companies. But 340 dollars, nobody can to tell there if it was enough to pay all the expense or not. They need another meeting; they need to talk with the big boss for to have another meeting. * ·* *

Q: You said there was a suggestion of 340 dollars per case?

A: Yes. * * * Mr. Orlando Bernardo gave the suggestion. * * *

Q: How was the suggestion received by the other members at the meeting?

A: Well, like I told you, they don't have power to decide. They need to talk with the other people inside the companies, their companies.... The people that was there don't have a power to decide because they need another meeting. And nobody was sure at this time is this 340 dollars was the correct price to pay for all these expenses that I told you that was skyrocketing, like EPA tests, legal expenses and these things. * * * The Mexico City was not the time for decide what the price to use because they are not prepared for this. They need to study a little bit and come with another meeting.

Defendants' Exhibit 21, *Deposition of Flavio Simoes* (November 17, 1994) at 56–59.[4]

### Analysis

■ In order for plaintiffs to make a submissible case on damages, they must provide evidence which would allow the jury to compare actual prices during the conspiracy period with reasonably estimated prices that would have prevailed during that same period, absent the conspiracy. Because plaintiffs cannot rely on Dr. Hoyt's expert opinion for this analysis, plaintiffs assert that the jury may use the above-mentioned evidence to support a reasonable inference that the estimated competitive price that would have prevailed from January 1, 1988 through December 31, 1992, would have been $340.00 in the absence of a conspiracy. The Court disagrees.

First of all, even if plaintiffs had evidence to support their last-ditch theory that $340.00 was the competitive wholesale price for Degesch America and Bernardo in 1988 and 1989, respectively, plaintiffs have not demonstrated that $340.00 represents a reasonable estimate of the competitive price for Degesch America after 1988, for Bernardo after 1989, or for any other defendant during any time period at all. To allow the jury to award damages against all defendants for the entire conspiracy period, based on such evidence, would require it to engage in rank conjecture. Accordingly, evidence that two defendants discussed a wholesale price of $340.00 on May 6, 1988 and May 8, 1989 does not create a genuine issue of fact which would allow the jury to reasonably infer that the competitive wholesale price for all defendants, absent the alleged conspiracy, was "at least $340.00" from January 1, 1988 through December 31, 1992.

If a conspiracy to charge higher prices in fact existed at the time of the subject conversations, it is possible—although not probable, given the context of the subject discussions— that $340.00 might represent a reasonable estimate of the competitive distributor price for Degesch America and Bernardo in 1988 and 1989, respectively. Ironically, however, plaintiffs have cited the identical discussions as evidence that defendants were engaged in a conspiracy to fix prices during 1988 and 1989, and that the agreed *conspiratorial* price was $340.00 per case.[5] Obviously, if

---

**4.** What may appear to be grammatical or transcription errors in this testimony are probably a result of the fact that English is not the deponent's primary language.

**5.** Plaintiffs contend that in 1988, McShares and Degesch America shared price information and worked jointly on pricing strategies with regard to Amphos, and that these discussions constituted an illegal plan between two competitors to adopt or follow a pricing formula. *Plaintiffs' Joint Response to Defendants' Motions for Sum-* *mary Judgment* (Doc. # 423), pp. 70–71. Specifically, plaintiffs cite Allen's notes of the May 6, 1988 meeting as support of their claim that Allen reported to the Germans on all his conversations with other competitors during that time period. *Plaintiffs' Response,* ¶ 74.

With regard to the May 8, 1989 meeting in Mexico City, plaintiffs contend that Bernardo's notes reflect that a $340.00 price was proposed, and "[f]ollowing this meeting Sullivan coordinated his pricing to the $340 per case." *Plaintiffs' Response,* ¶¶ 94 and 96.

defendants proposed a $340.00 *conspiratorial* price, their proposal provides no evidence that the *competitive* price was also $340.00, unless (and this is a theory which plaintiffs do not espouse) defendants conspired to set prices at naturally competitive, non-conspiratorial levels.

Plaintiffs provide the Court virtually no guidance with regard to a plausible theory in support of their newborn premise that $340.00 per case represents a competitive wholesale price, as opposed to a conspiratorial wholesale price. Nevertheless, out of an abundance of caution and in light of the unique circumstances surrounding the parties' briefing on the summary judgment motions,[6] the Court has scoured the record to determine whether plaintiffs have a submissible case for their theory. Based on that review, the Court finds no genuine issue of material fact which warrants a trial as to fact of injury.

### Amphos Discussions

Discussions between Degesch America, McShares and the Germans, including the May 6, 1988 meeting on which plaintiffs rely, represent the bulk of the evidence which plaintiffs cite in support of their claim that Degesch America was involved in a price-fixing conspiracy in 1988. *See Plaintiffs' Joint Response to Defendants' Motions for Summary Judgment* (Doc. # 423), pp. 43–44 and 70–71. Specifically, plaintiffs contend that by sharing price information and working jointly on pricing strategies with regard to the Amphos limited partnership, McShares, Degesch America and the Germans engaged in illegal price planning. *Plaintiffs' Response*, pp. 70–71. In context, however, those conversations do not support a reasonable inference that Degesch America and McShares were conspiring to charge prices higher than they were actually charging at that time—or, conversely, that their non-conspiratorial or competitive prices were lower than what they were charging at the time.

The Amphos limited partnership, formed in 1988, manufactures technical grade (raw) aluminum phosphide. It sold raw product to Degesch America, which manufactured finished aluminum phosphide products. McShares had an exclusive distribution agreement with the Germans, and the Germans supplied that contract through Degesch America. The Germans controlled the price at which Amphos sold raw aluminum phosphide product to Degesch America and, as a limited partner, McShares had no ability to determine that price.

Degesch America is the general partner of Amphos; limited partners include McShares, the Degesch group, and related individuals. Before McShares agreed to invest as a limited partner in Amphos, McShares, Degesch America, and the Germans discussed many details of the proposed Amphos operation. Their discussions addressed, among other things, the price at which Amphos would sell to Degesch America, and the price at which Degesch America would sell finished aluminum phosphide products to distributors.

In March 1988, before Amphos was formed, Allen (McShares) met with Sullivan (Degesch America) to discuss the partnership formation and other preliminary matters relating to Amphos. According to Allen's notes from the meeting, the Germans (who had been supplying raw materials to Degesch America) wanted Amphos to charge Degesch America the same price for raw materials that the Germans themselves had been charging. *See* Plaintiff's Exhibit 34. According to Allen, he and Sullivan discussed the fact that Degesch America and McShares needed to bring their prices down, to compete with Bernardo. *Id.* In an effort to convince the Germans that Amphos prices would have to be lower than what Degesch America had been paying for raw product, they also discussed with each other their views on what price Amphos should charge Degesch America for raw materials. *Id.*

---

6. At the time plaintiffs filed their response to defendants' motions for summary judgment (April 24, 1995), the Court had not yet ruled on the admissibility of Dr. Hoyt's report and plaintiffs relied heavily on his report to show fact of injury and amount of damages. After the Court struck major portions of Dr. Hoyt's report, the Court gave the parties an opportunity to file supplemental memoranda addressing the impact of the ruling on the motions for summary judgment. In these memoranda plaintiffs first raised their theory that $340.00 represents a reasonable competitive price; however, plaintiffs did not fully brief a plausible theory on this issue.

On May 6, 1988, all of the general and limited partners met to discuss the terms of the limited partnership agreement and the Amphos project. According to Allen's notes of the meeting, Sullivan and Allen attempted to persuade the Germans that Amphos should sell raw product to Degesch America at a lower price, so that Degesch America and McShares could compete with lower prices against Bernardo and Inventa. *See* Plaintiffs' Exhibit 26, p. 3 and 6. According to Allen, Sullivan stated that he would have to sell to distributors at $340.00 in order to let them compete. *Id.* at p. 6.

On December 8, 1988, Allen and Sullivan met again with the Germans. Allen's notes from the meeting reflect an agreement that Amphos would sell to Degesch America at $11.50/kg. Plaintiffs' Exhibit 28, p. 1. According to Allen, the parties also discussed that Degesch America would sell finished product to distributors at $350.00 to $360.00 per case, with McShares' cost at $327.00 per case. *Id.* at p. 2. The next day, Allen signed the limited partnership agreement on behalf of McShares. *Id.*

The Amphos discussions between McShares, Degesch America and the Germans indicate that any discussion or concerted effort between McShares and Degesch America was to convince the Germans to let Amphos charge lower prices for technical aluminum phosphide so that McShares and Degesch America could compete more successfully against Bernardo and Inventa. Nothing in the record supports a reasonable inference that the parties were conspiring to charge their then current prices, which were higher than $340.00, or that $340.00 is the price that would have prevailed absent a conspiracy. The only reasonable inference from the Amphos conversations is that if a conspiracy existed, it was for McShares and Degesch America to charge lower prices, *i.e.* $340.00 per case. Thus, these discussions do not create a genuine issue of material fact with respect to the non-conspiratorial wholesale price for aluminum phosphide.

### Bernardo Discussions

Likewise, the record does not support a reasonable inference that in 1989, Bernardo's non-conspiratorial price to distributors was $340.00 per case. In the second quarter of 1989, Bernardo's weighted average price to distributors and end-users was $328.89 per case. See Plaintiffs' Exhibit 4, Dr. Hoyt's Report, Table 2. This suggests that Bernardo's distributor price in May of 1989 was well below $340.00. Thus, the only reasonable inference from the May 8 meeting is that Bernardo suggested $340.00 per case as a conspiratorial price, not a competitive price.

### Conclusion

On this record, a jury could not reasonably agree with plaintiffs that Degesch America and Bernardo admitted that $340.00 was a competitive price in 1988 or 1989. Indeed, the only reasonable inference is to the contrary: if anything, Degesch America and Bernardo suggested $340.00 per case as a conspiratorial wholesale price, not as a competitive wholesale price. Thus, plaintiffs have not met their burden of demonstrating that $340.00 constitutes a reasonable estimate of the competitive wholesale price for Degesch America and Bernardo in 1988 and 1989, respectively, and on this theory they cannot avert defendants' motions for summary judgment as to fact of injury.

**IT IS THEREFORE ORDERED** that for the reasons stated above, and for the reasons stated at the status conference on August 30, 1995, *Defendant McShares, Inc.'s Separate Motion for Summary Judgment* (Doc. # 394), filed April 10, 1995; the *Motion for Summary Judgment of Defendants United Phosphorus, Ltd., and Inventa Corporation* (Doc. # 400), filed April 10, 1995; the *Motion of Defendants Degesch America, Inc., Pestcon Systems, Inc., Detia Degesch GmbH and Detia Freyberg GmbH for Partial Summary Judgment* (Doc. # 405), filed April 10, 1995; and the *Motion of Defendant McShares, Inc. for Partial Summary Judgment* (Doc. # 418), filed April 21, 1995, are sustained with respect to plaintiffs' claims for damages based on sales of cases of aluminum phosphide products outside of 1990, and overruled with respect to plaintiffs' claims for damages based on sales of cases of aluminum phosphide products in 1990. A further written order will follow.

## MEMORANDUM AND ORDER
## ON RECONSIDERATION

This price-fixing antitrust case comes before the Court on *Plaintiffs' Motion to Reconsider the Court's Order of September 8, 1995* (Doc. # 533) filed September 18, 1995, and *Defendants' Joint Motion for Partial Summary Judgment on the Statute of Limitations* (Doc. # 398) filed April 10, 1995. For reasons stated more fully below, the Court finds that both motions should be and hereby are sustained.

### I. *Plaintiffs' Motion to Reconsider*

On September 8, 1995, the Court entered its *Memorandum and Order* (Doc. # 525) which held that price discussions among certain defendants (referencing a proposed price of $340.00 per case) did not sufficiently establish a triable issue with respect to fact of injury or amount of damages. Plaintiffs contend that the Court substantially erred with respect to the standard of review, the applicable law, and the germane facts.

▆▆▆ "[A] motion to reconsider is purely a creature of local rule and is not covered by any provision of the Federal Rules of Civil Procedure." *Prudential Securities Inc. v. LaPlant,* 151 F.R.D. 678, 678 (D.Kan.1993). Such motion is appropriate when the Court has obviously misapprehended a party's position, the facts, or the applicable law, or when a party produces new evidence that could not have been obtained through the exercise of due diligence. *Anderson v. United Auto Workers,* 738 F.Supp. 441, 442 (D.Kan.1990). "Revisiting the issues already addressed is not the purpose of a motion to reconsider, and advancing new arguments or supporting facts which were otherwise available for presentation when the original summary judgment motion was briefed is likewise inappropriate." *Comeau v. Rupp,* 810 F.Supp. 1172, 1174 (D.Kan.1992) (citations and quotations omitted).

▆▆▆ Plaintiffs contend that applicable law imposes a presumption of impact where defendants with market power fix prices. *See Plaintiffs' Motion to Reconsider,* p. 12 and *Plaintiffs' Response to Supplemental Memorandum of Defendants Degesch America, Pestcon, Detia Degesch and Detia Freyberg in Support of Their Motions for Summary Judgment* (Doc. # 518), pp. 4–6. In support of their proposition, plaintiffs cite several cases which have found, in the class certification context, that fact of injury may be proven on a class-wide basis. *See id.* Plaintiffs rely on language from cases such as *In re Folding Carton Antitrust Litigation,* 75 F.R.D. 727, 734 (N.D.Ill.1977) ("Courts have consistently held that an illegal price fixing scheme presumptively impacts upon all purchasers of a price fixed product *in a conspiratorially affected market.*") (emphasis added), and *In re Wirebound Boxes Antitrust Litigation,* 128 F.R.D. 268, 272 (D.Minn. 1989) ("Proof of impact *typically* follows proof of a price-fixing agreement where the defendants have the requisite market power.") (emphasis added). In addition, plaintiffs cite *Union Carbide and Carbon Corp. v. Nisley,* 300 F.2d 561, 579 (10th Cir.1961) ("the prolonged existence of a price-fixing conspiracy in an integrated industry ... is proof of damages *to those whose prices are directly affected thereby* ") (emphasis added).

Inherent in all of these cases, including the language quoted by plaintiffs, is the requirement that plaintiffs show that prices paid during the conspiracy were *affected* by the alleged price fixing, *i.e.,* that conspiratorial prices were higher than prices would have been absent the conspiracy. Plaintiffs have not cited a single case in which the court presumed impact based on the fact of price fixing alone. The law does not permit such a presumption. Section 4 of the Clayton Act permits recovery of civil damages for persons who are "injured" in their business or property by anything forbidden in the antitrust laws. 15 U.S.C. § 15. Courts have consistently required that before plaintiffs may recover a reasonably estimated amount of damages, they first must "certainly prove" that they were injured as a result of defendants' challenged conduct. *See, e.g., Greater Rockford Energy and Technology Corp. v. Shell Oil Co.,* 998 F.2d 391, 401 (7th Cir. 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994); *Amerinet, Inc. v. Xerox Corp.,* 972 F.2d 1483, 1494 (8th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993); *Federal Prescription Service, Inc. v. American Pharmaceutical Ass'n,* 663 F.2d 253, 268

(D.C.Cir.), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982); *Van Dyk Research Corp. v. Xerox Corp.,* 631 F.2d 251, 255 (3d Cir.1980), *cert. denied,* 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981); *Southern Pacific Communications Co. v. American Telephone and Telegraph Co.,* 556 F.Supp. 825, 1058 (D.D.C.1982), *aff'd,* 740 F.2d 980 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985).

▆ Plaintiffs argue that even without a presumption of impact, fact of injury is "clearly evident" from the following facts: (1) certain defendants (Degesch America and Casa Bernardo) discussed a competitive price of $340.00 at a time when defendants were charging prices higher than $340.00; and (2) Research, Degesch America and Pestcon communicated and coordinated prices in an effort to maintain prices.[1]

## Plaintiffs' Theory

Plaintiffs' factual theory is that between 1988 and 1990, Degesch America, Research Products, and Pestcon engaged in a price-fixing conspiracy in the form of price stabilization: they stabilized or attempted to stabilize aluminum phosphide prices in the face of declining demand and new market entrants. Beginning in 1990, these same defendants—with Casa Bernardo and others—conspired to "jack up prices." More specifically:

In the mid–1980's, Degesch America, Research Products, and Pestcon dominated the aluminum phosphide industry. *Plaintiffs' Motion To Reconsider The Court's Order of September 8, 1995 [Motion]* (Doc. # 533) filed September 18, 1995, at 2–3. These defendants engaged in price fixing as early as 1988, with the result of "remarkably similar pricing" among the three competitors *Motion* at 3; *Pretrial Order* (Doc. # 371) at

4. By September, 1987, Research learned that Casa Bernardo—a new competitor—was selling direct to the consumer at a price 15–20 percent below Research's cost. *Motion* at 4. In late 1987, Research's president (Jim Allen) concluded that Casa Bernardo's pricing policy had the market "screwed up," and that Casa Bernardo had to be brought "in line." *Motion* at 4. Degesch America, also aware of the threat from Casa Bernardo, suggested to its parent company (Degesch GmbH) that they and Research "make some decision with regard to opposing Casa Bernardo." *Motion* at 3, 4. Research and Degesch America communicated with each other in this regard.

With the entry of Casa Bernardo, by May and June of 1988, four firms dominated the aluminum phosphide market: Degesch America, Research Products, Pestcon, and Casa Bernardo. *Motion* at 7. During this time, three of the four competitors—Degesch America, Research Products, and Pestcon—engaged in "continuous communications" relating to pricing. *Pretrial Order* at 4. In May, 1988, Research and Degesch America met with the German companies in Germany. At the meeting, Research stated that it was important for Degesch America's distribution system to be kept intact and that to accomplish this end, the system had to be able to compete and to make a reasonable profit. Degesch America stated that in order to let Degesch America's distributors compete, Degesch America had to be able to sell to distributors at $340.00 per case. *Motion* at 5.

In May, 1988, Pestcon communicated news of price decreases to its competitors. *Motion* at 6. Bill Griffith, former employee of Pestcon, testified that George Kornstad, for-

---

1. In support of this argument, plaintiffs misstate the holdings of *King & King Enterprises v. Champlin Petroleum Co.,* 657 F.2d 1147, 1158 (10th Cir.1981), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982) and *Farley Transp. Co. v. Santa Fe Transp. Co.,* 786 F.2d 1342, 1349–50 (9th Cir.1985). Plaintiffs assert that *King & King* held that "conversations with competitors about prices is 'an overabundance' of evidence as to the impact element," *Plaintiffs' Motion to Reconsider,* p. 14; however, that case found that there was an overabundance of evidence from which the jury could conclude that

defendants fixed prices, and that such activity *injured* plaintiffs. *King & King,* 657 F.2d at 1158. Plaintiffs also state that *Farley* recognized that "weaknesses in evidence on causation go to the sufficiency of proof of damages, *not* fact of injury." *Plaintiffs' Motion to Reconsider,* p. 14. In *Farley,* the Court found that defendant lost its right to challenge the sufficiency of the evidence due to its failure to request a directed verdict. *Farley,* 786 F.2d at 1349. Under those circumstances, the court found that weaknesses in evidence on causation went to sufficiency of proof on amount of damages.

mer president of Pestcon, communicated pricing changes to competitors in order to maintain the prices of aluminum phosphide pellets and tablets. *Motion* at p. 6. On June 27, 1988, both Research Products and Degesch America relayed to Germany the news of Pestcon's price decrease. *Motion* at 6. The following day, Degesch America reduced its distributor price.

Plaintiffs claim that "defendants admitted in 1988 that the competitive price for distributors in 1988 was *at least as low* as $340 per 21 kg case, and that a $340 per 21 kg case *minimum* price was discussed in 1989." *Motion* at 8. On the latter point, plaintiffs cite a meeting in May, 1989, in which Casa Bernardo proposed a minimum distributor price of $340 per case. Plaintiffs argue from this evidence that "[d]efendants acted on their thoughts and thus, there is evidence of 'impact' in light of the recorded price adjustments made during the time period which were above the competitive prices, as identified by the defendants themselves." *Motion* at 8.

Beginning in June, 1989, Degesch America lowered its price to $340 per case—the weighted average price of Casa Bernardo. *Motion* at 8. "Similarly, in the third and fourth quarters of 1989, the weighted average price of both Pestcon and Research likewise *declined* to a level above $340.00 per case of pellets and tablets." *Motion* at 8. Plaintiffs claim that these reductions were "coordinated price adjustments," *Motion* at 14, and that while Research and Degesch America conspired to charges prices lower than those they had reaped in the past, the lower prices were still "artificially high." *Motion* at 18.

## Analysis

In order to create an issue of triable fact with respect to fact of injury, plaintiffs must adduce at least some evidence from which a jury could reasonably find that wholesale prices exceeding $340 per case in 1988 and 1989 were a result of the alleged conspiracy. This burden is not met by the mere fact that defendants were discussing prices, or that defendants met for that purpose. Plaintiffs must show "as a matter of fact and with a fair degree of certainty" that their damages resulted from the alleged conspiracy. *E.g., McClure v. Undersea Indus., Inc.,* 671 F.2d 1287, 1289 (11th Cir.1982), *cert. denied,* 460 U.S. 1037, 103 S.Ct. 1427, 75 L.Ed.2d 788 (1983); *Shreve Equip., Inc. v. Clay Equip. Corp.,* 650 F.2d 101, 105 (6th Cir.1981), *cert. denied,* 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1982); *Copper Liquor, Inc. v. Adolph Coors Co.,* 624 F.2d 575, 580 (5th Cir.1980).

The record is less than clear on plaintiffs' theory with respect to using defendants' statements of the $340.00 price to show fact of injury and amount of damages. Nevertheless, out of a double-abundance of caution, the Court will again strive to put together the pieces of plaintiffs' theory.[2] The Court can conceive of no plausible theory which would support the argument that Casa Bernardo's statement in 1989 comprises evidence of fact of injury or would provide a reasonable benchmark to estimate amount of damages. At the time of the statement, Bernardo's prices were at or below $340.00. Thus, there is no inference that Bernardo would have charged $340.00 absent the alleged conspiracy; it was charging $340.00 or less at

2. When defendants first filed their motions for summary judgment, plaintiffs relied heavily on Dr. Hoyt's expert testimony in opposing such motions on the issues of fact of injury and amount damages. Subsequently, the Court struck those portions of Dr. Hoyt's report which related to fact of injury and damages, leaving plaintiffs with no evidentiary proof in response to defendants' motions on those issues. See *Memorandum and Order* (Doc. # 443) filed May 5, 1995. The Court allowed the parties to file supplemental briefs, not to exceed ten pages, addressing the ramifications of the Hoyt ruling on the motions for summary judgment. Plaintiffs filed three supplemental briefs, each under ten pages. In one of those briefs, plaintiffs first raised the theory that discussions between certain defendants in 1988 and 1989 demonstrate that the competitive wholesale price of aluminum phosphide to distributors was "at least" $340.00. See *Plaintiffs' Response to Supplemental Memorandum of Defendants Degesch America, Pestcon, Detia Degesch and Detia Freyberg in Support of Their Motions for Summary Judgment* (Doc. # 518) filed August 23, 1995. In that brief and in their motion to reconsider, plaintiffs' attempt to explain its theory on fact of injury and amount of damage, and to reconcile that new theory with earlier positions taken in this case, has been less than ideal.

the time Orlando Bernardo made the statement in question.

Upon reconsideration, the Court believes that a material issue exists with respect to fact of injury and amount of damages for 1988 through 1989, when defendants lowered their distributor price to $340.00.[3] Construed in light most favorable to plaintiffs, the record creates a fact issue with respect to whether Detia Degesch, Degesch America, Research Products and Pestcon were conspiring in 1988 and 1989 to maintain and/or coordinate a decline in prices. Evidence of this conspiracy combined with Bernardo's entry into the market charging substantially lower prices (at well below $340.00 a case), defendants' concerns that Bernardo's low prices were "screwing up" the market and that defendants would have to get Bernardo "in line," and Jerry Sullivan's statement that in order to let distributors compete Degesch America would have to sell to them at $340.00 a case, supports a reasonable inference that but for the alleged conspiracy to charge then higher prices, defendants' competitive prices would have been lower than what they were currently charging. *See Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 435 (5th Cir.1985) (fact of damage in horizontal price-fixing case may be shown simply by proof of purchase at price higher than competitive rate).

Once plaintiffs demonstrate fact of injury, their burden to show the amount of damage is substantially lighter. *See, e.g., Amerinet*, 972 F.2d at 1494 (once causation of damages established amount of damages may be determined by just and reasonable estimate) (quoting *MCI Communications Corp. v. American Telephone and Telegraph Co.*, 708

F.2d 1081, 1161 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983)). Plaintiffs contend that Sullivan's statement constitutes an admission that but for the conspiracy, defendants would have charged $340.00. Defendants contend that this figure does not account for various market factors, including defendants' costs. A jury might reasonably infer otherwise, however, at least for limited periods of time in 1988. Sullivan—as president of Degesch America and as a co-conspirator familiar with then market conditions—arguably accounted for such factors in his 1988 statements. Of course defendants are free to rebut this evidence at trial. The evidence raises a fact issue whether $340.00 represents a just and reasonable estimate of what defendants would have charged distributors, absent the alleged conspiracy, in 1988 to that time in 1989 when defendants' prices reached $340.00 or lower.[4]

## II. *Defendants' Motion for Partial Summary Judgment on Statute of Limitations*

Because the Court finds that a material issue of fact exists with respect to fact of injury and amount of damages for 1988 and 1989, the Court will address *Defendants' Joint Motion for Partial Summary Judgment on the Statute of Limitations* (Doc. # 398) filed April 10, 1995. Plaintiffs filed their complaint in this action on November 3, 1993. Defendants claim that the four-year statute of limitations contained in Section 4B of the Clayton Act, 15 U.S.C. § 15b, bars plaintiffs' claims for damages prior to November 3, 1989. Plaintiffs assert that their

---

**3.** After defendants lowered their prices to $340.00, plaintiffs have no evidence of fact of injury, *i.e.*, that prices would have been less absent the alleged conspiracy. Plaintiffs state that Degesch America lowered its price to $340.00 in June of 1989. Plaintiffs motion is unclear whether and when Research and Pestcon lowered their prices to $340.00, but plaintiffs have not demonstrated that the $340.00 is relevant to fact of injury and amount of damages for 1990.

**4.** In so holding, the Court expresses no view concerning the time period to which plaintiffs' theory might reasonably apply. Plaintiffs' theory is fraught with many problems, some of which

are identified in the *Memorandum of United Phosphorus and Inventa Corporation in Opposition to Plaintiffs' Motion to Reconsider the Court's Order of September 8, 1995*, attached as Exhibit A to *Defendants' Motion for Leave to File Supplemental Brief in Opposition to Plaintiffs' Motion to Reconsider the Court's Order of September 8, 1995* (Doc. # 585), filed October 2, 1995. In this opinion, the Court holds merely that plaintiffs' theory affords a slim but tenable basis for a finding of fact of injury; the Court is not predicting that such theory—given the changing market conditions and other evidence—could support any calculations of substantial damages throughout the entire period of the alleged conspiracy.

claims for 1988 and 1989 are tolled by defendants' fraudulent concealment.

In order to prove fraudulent concealment in this antitrust action, plaintiffs must plead and prove the following elements: (1) affirmative acts of concealment by defendants; (2) successful concealment from plaintiffs; and (3) plaintiffs' due diligence until discovery of the facts. *State of Colo. ex rel Woodard v. Western Paving Const. Co.*, 630 F.Supp. 206, 208 (D.Colo.1986), *aff'd by equally divided en banc court*, 841 F.2d 1025 (10th Cir.), *cert. denied*, 488 U.S. 870, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988). The concealment element requires proof that defendants engaged in affirmative conduct designed to lead a reasonable person to believe that he or she did not have a claim for relief. *Western Paving*, 630 F.Supp. at 209. This standard requires "affirmative steps in addition to the original wrongdoing to prevent the plaintiff from discovering the wrong." *Id.* at 210. The diligence element imposes a positive duty on plaintiffs to use diligence in discovering their cause of action within the limitations period. *Id.* at 209. The statute is not tolled by mere unawareness of law or facts. *Id.*

Plaintiffs assert that defendants have the burden of proof on summary judgment to show that plaintiffs do not have a claim for fraudulent concealment, citing *In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 782 F.Supp. 487 (C.D.Cal.1991). In that case, the court noted that the three elements of fraudulent concealment are factual questions and that ordinarily defendant has an extremely difficult burden to show that fraudulent concealment allegations are barred as a matter of law. *Id.* at 489. The court did not, however, shift the burden to defendant at the summary judgment stage. *See id.* at 491 (plaintiffs must raise genuine issue that they had no knowledge of facts giving rise to claim despite due diligence). Nor does this Court believe that the law in this circuit would permit such a result. *See King & King*, 657 F.2d at 1154 (party asserting fraudulent concealment has burden of showing elements of claim); *Western Paving*, 630 F.Supp. at 209 (same); *Sinclair Oil Corp. v. Atlantic Richfield Co.*, 720 F.Supp. 894, 907 (D.Utah 1989) (fraudulent concealment issue treated like any other on summary judgment). *See also, Berkson v. Del Monte Corp.*, 743 F.2d 53, 56 (1st Cir.1984) (plaintiff failed to raise genuine fact issue on first and third elements of fraudulent concealment; conclusory allegations not enough), *cert. denied*, 470 U.S. 1056, 105 S.Ct. 1765, 84 L.Ed.2d 826 (1985).

As with any other motion for summary judgment, once defendants have met their initial burden of showing that there is an absence of any genuine issue of material fact, plaintiffs bear the burden of demonstrating that genuine issues remain for trial as to those dispositive matters for which they carry the burden of proof. *Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986); *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993).

Moreover, under Rule 9(b) of the Federal Rules of Civil Procedure, plaintiffs must plead the circumstances surrounding fraudulent concealment with particularity. Plaintiffs devote one sentence in the *Pretrial Order* (Doc. # 371) to their claim of fraudulent concealment. Specifically, plaintiffs state, "Since the price fixing conspiracy was carried out secretly, the class members had no way of knowing that the purchase price of aluminum phosphide products was at supracompetitive levels." *Pretrial Order* at p. 4. Plaintiffs claim that Rule 9(b) is intended to permit defendants to frame a responsive pleading and that defendants have waived the right to complain about lack of particularity in plaintiffs' pleading. This misses the mark. Plaintiffs clearly have the burden at the summary judgment stage to demonstrate

genuine issues of fact with respect to the circumstances surrounding concealment and the facts supporting due diligence. *See Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499, 502 (9th Cir.1988), *cert. denied,* 488 U.S. 1010, 109 S.Ct. 795, 102 L.Ed.2d 786 (1989); *Stegeman v. Aetna Ins. Co.*, 1980 WL 1815, *2 (E.D.Mich.1980); *Commonwealth of Virginia v. Meadow Gold Dairies, Inc.*, 1993 WL 476633, *2 (W.D.Va.1993); *United Nat'l Records, Inc. v. MCA, Inc.*, 609 F.Supp. 33, 39 (N.D.Ill.1984).

■ Plaintiffs contend that defendants affirmatively concealed their activities in the following ways: (1) holding secret meetings both within and outside the United States, not only to fix prices but also to conceal the conspiracy from public view; (2) keeping their conspiracy so secretive that officers within their own companies did not know of the meetings until shortly before the criminal trial; (3) not revealing the extent of their price-fixing to the Department of Justice until the eve of the criminal trial; and (4) misrepresenting the reasons for and staggering price increases in 1990.

The fact that defendants did not confess their price-fixing conspiracy to the Department of Justice does not comprise a fraudulent act of concealment. *King & King*, 657 F.2d at 1155 (denial of accusation of wrongdoing does not constitute fraudulent conceal-

ment) (quoting district court opinion, 446 F.Supp. 906, 911 (E.D.Okla.1978)).

Likewise, plaintiffs have not created a triable issue with respect to defendants alleged secrecy. They do not cite any specific actions by defendants to keep their meetings a secret, nor do they point to any conduct by defendants to keep price-fixing a secret from their employees.[5] Thus, on this record, plaintiffs have failed to establish a genuine issue as to whether defendants' alleged secrecy constitutes an affirmative act of concealment.[6] *See Berkson*, 743 F.2d at 56 (plaintiff must allege facts showing affirmative conduct of concealment; silence or passive conduct is not fraudulent unless parties' relationship imposes duty to disclose) (citing *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir.1978)).

Plaintiffs' allegation that defendants misrepresented the reasons for and staggered price increases in 1990 comes closer to the type of conduct that may constitute an affirmative act of concealment. *See, e.g., United Nat'l Records*, 609 F.Supp. at 36 (statements explaining parallel price increases went beyond mere denial of wrongdoing). However, plaintiffs have failed to establish a genuine issue for trial with respect to whether defendants' attempts at concealment were successful and whether plaintiffs exercised due diligence to discover their claims.

**5.** Plaintiffs cite the testimony of Ashar, officer of Inventa, who stated that he does not recall Shroff ever telling him about the price discussions in Rio and that Shroff told him that the Rio participants talked about toxicity and research. Plaintiffs do not dispute that technical matters were discussed at the Rio meeting. Plaintiffs also cite the testimony of Luziach, vice-president of Degesch America, who said that he did not talk with Geiss about the Rio meeting until 1993 or 1994 and is not personally aware of any antitrust violations from 1988 to 1993. On this record, the alleged secrecy amounts to nothing more than a failure to inform employees about the price-fixing agreement; it does not constitute an affirmative act of concealment. *See Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499, 505 (9th Cir.1988) (passive concealment of information not enough to toll limitations), *cert. denied,* 488 U.S. 1010, 109 S.Ct. 795, 102 L.Ed.2d 786 (1989); *State of Texas v. Allan Const. Co.*, 851 F.2d 1526, 1529 (5th Cir.1988) (concealment by silence is not enough).

**6.** The standard for what acts qualify as affirmative acts of concealment is somewhat unclear under Tenth Circuit law. *Western Paving* appears to require that the acts be in addition to and separate from the original wrongdoing. *Western Paving*, 630 F.Supp. at 210; *see also Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 874 F.Supp. 721, 724 (W.D.Va. 1994) (Tenth Circuit requires that concealment acts be separate and apart from conspiratorial acts). However, in *King & King*, which has not been overruled, the Tenth Circuit held that fraudulent acts of concealment existed where defendant actively concealed its price-fixing activities, through actions which were arguably in furtherance of the conspiracy, and where defendant's fraudulent conduct was inherently self concealing. *King & King*, 657 F.2d at 1156. Because plaintiffs do not create a genuine issue of fact with respect to specific acts of secrecy by defendants, however, the Court need not resolve whether such acts would satisfy the first prong of the fraudulent concealment test under Tenth Circuit law.

Defendants assert that plaintiffs learned of facts which should have excited inquiry into their claims. They cite the deposition testimony of Cynthia Colvin Koehler, president and owner of class representative Anchor Fumigation and Pest Control. Koehler testified that in 1989, she conducted a marketing and purchasing survey and concluded that the price of aluminum phosphide was high and that it was similar among certain sellers. From this, she concluded that something was "seriously wrong in the market." Defendants also cite facts supporting that plaintiffs' counsel was contacted in 1990 concerning antitrust issues in the aluminum phosphide industry.

Plaintiffs state that defendants cannot show as a matter of law that plaintiffs had knowledge of a price-fixing scheme prior to October 1993, when the criminal indictments were unsealed. This misses the point. Defendants have cited evidence that plaintiffs were aware of or should have been aware of facts which would excite inquiry into their claims. In response, plaintiffs provide nothing but conclusory allegations that they did not know of the conspiracy, without citing affidavits or other parts of the record. This showing does not create a genuine issue either that plaintiffs did not have knowledge of their claims or that plaintiffs were not aware of facts which would excite inquiry into their claims. *See Phelps v. Washburn University of Topeka,* 634 F.Supp. 556, 569 (D.Kan.1986) (conclusory statements and unsubstantiated allegations cannot defeat motion for summary judgment).

Likewise, plaintiffs fail to create a genuine issue with respect to due diligence; they conclusively declare, without evidentiary support, that they have at all times diligently pursued their claims. This is not enough to defeat summary judgment. *See Berkson,* 743 F.2d at 56 (conclusory allegations of due diligence insufficient); *Akron Presform Mold Co. v. McNeil Corp.,* 496 F.2d 230, 234 (6th Cir.) (failure to demonstrate by affidavit or otherwise that it exercised due diligence fatal

to plaintiff's fraudulent concealment claim), *cert. denied,* 419 U.S. 997, 95 S.Ct. 310, 42 L.Ed.2d 270 (1974).

On this record, plaintiffs have failed to create a genuine issue for trial with respect to their fraudulent concealment claim.

**IT IS THEREFORE ORDERED** that *Plaintiffs' Motion to Reconsider the Court's Order of September 8, 1995* (Doc. # 533) filed September 18, 1995, should be and hereby is sustained as to plaintiffs' claims for damages in 1988 and 1989.[7]

**IT IS FURTHER ORDERED** that *Defendants' Joint Motion for Partial Summary Judgment on the Statute of Limitations* (Doc. # 398) filed April 10, 1995, should be and hereby is sustained.

---

7. Because the record is unclear whether and when Research and Pestcon's distributor prices fell to $340.00, claims for damages caused by them conceivably may exist for the time period after November 3, 1989 and before 1990—time that is not barred by the four-year statute of limitations. The Court is unable to make a ruling on this time period, however, because the record is incomplete with respect to when Research and Pestcon's distributor prices dropped to $340.00 a case.